UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

ROSE WANJUGU MWANGI,

                           Plaintiff,              Case No. 21-CV-6728

           -against-                     **COMPLAINT**

PASSBASE, INC., as well as MATHIAS KLENK,    **JURY TRIAL DEMANDED**
and DAVE MCGIBBON, individually,

                         Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -X

    Plaintiff ROSE WANJUGU MWANGI ("Plaintiff" or "Ms. Mwangi") by her attorneys, FILIPPATOS PLLC, hereby complains of Defendants, upon personal knowledge, as well as information and belief, by alleging and averring as follows:

## NATURE OF THE CASE

    1.      This is a case against, *inter alia*, Defendant PASSBASE, Inc. ("Defendant," "PASSBASE," or "the Company"), a start-up identity verification company founded and run by three Caucasian men, two of whom traffic in racist and sexist tropes and micro-aggressions with callous and reckless abandon. Indeed, despite claiming to be a diversity-minded enterprise, Defendant PASSBASE set a very low bar for its policies and initiatives regarding diversity and inclusion, all while tolerating a toxic work environment based on the same old entrenched racism and sexism that continue to plague our country.

    2.      Ironically, Co-Founder and former CEO Mathias Klenk, who is presently the CTO of Defendant PASSBASE and himself a Defendant herein – hereinafter "Defendant" or KLENK -- gave an interview in 2019 where he touted the Company as "an exciting and inclusive place to work" and bragged that "[s]ince many high-growth startups

dropped the priority for this [i.e., diversity and inclusion] in order for growth. We want to get this right from the beginning." For Ms. Mwangi, nothing proved to be further from the truth.

3.        This action is brought by Filippatos PLLC on behalf of Plaintiff, Rose Wanjugu Mwangi ("Ms. Mwangi"), an African American woman with enormous heart and immense courage, who seeks to hold Defendant PASSBASE (and elements of its Founding Team) accountable under the federal, state, and local laws strictly prohibiting workplace discrimination or retaliation on the basis of race, color, or gender.

4.        Specifically, Ms. Mwangi brings this action alleging that Defendants have violated Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981 ("Section 1981"); the New York State Human Rights Law, New York State Executive Law, §§ 296, et seq. ("NYSHRL"); the New York City Human Rights Law, New York City Administrative Code §§ 8-107, et. seq. ("NYCHRL"); and the common law of contracts. Contemporaneous with the filing of this action, Ms. Mwangi has timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") and, upon receiving a Notice of Right to Sue from the EEOC, intends to amend this action to assert corollary claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e, et seq., ("Title VII").

5.        Plaintiff seeks damages, as well as injunctive and declaratory relief, to redress the injuries she has suffered – physical, emotional, and pecuniary – as a result of being discriminated and retaliated against by her employer on the basis of her race (African American), color (Black), and gender (female).

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

6.        Jurisdiction of this Court is proper under 28 U.S.C. §§ 1331, 1332, and 1343.

7.      The Court has supplemental jurisdiction over the claims brought by Ms. Mwangi under state and city law pursuant to 28 U.S.C. § 1367.

8.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b), as one or more of the Defendants reside within the Southern District of New York, or the acts complained of occurred therein.

9.      Contemporaneously with the filing of this Complaint, copies thereof have been mailed to the New York City Commission of Human Rights ("NYCCHR") and the Office of the Corporation Counsel of the City of New York pursuant to the notice requirements of § 8-502 of the New York City Administrative Code; accordingly, Ms. Mwangi has satisfied all the procedural prerequisites for the commencement of the instant action. A copy of the transmittal letter to the NYCCHR, *et ano.*, is annexed hereto as Exhibit A.

## THE PARTIES

10.      At all times relevant hereto, Plaintiff is and has been a resident of the country of Germany and the city of Berlin.

11.      Plaintiff is African American.

12.      Plaintiff is a citizen of the United States of America.

13.      At all times relevant hereto, Defendant PASSBASE was and is a privately held corporation duly existing pursuant to, and by virtue of, the laws of the State of Delaware. The Company maintains a principal place of business located at 179 Franklin Street, 3rd Floor, New York, NY 10013.

14.      Upon information and belief, Defendant PASSBASE employs over 35 employees in an integrated global enterprise and thus is subject to all statutes upon which Plaintiff is proceeding herein.

15.     Despite any nomenclature to the contrary, at all times relevant herein, Plaintiff was an employee of the Company, who discharged her job duties and responsibilities under the absolute control – and at the behest – of the Company.

16.     Upon information and belief, at all times relevant herein, Defendant KLENK is and has been a resident of New York and held the positions of CEO or CTO with the Company, and as such has had the power and authority to materially impact and affect the terms and conditions of Plaintiff's employment.

17.     Upon information and belief, at all times relevant herein, Defendant Dave McGibbon ("Defendant" or "MCGIBBON") is and has been a resident of New York and held the positions of CEO or COO with the Company, and as such has had the power and authority to materially impact and affect the terms and conditions of Plaintiff's employment.

18.     The defendants recited separately immediately hereinabove are sometimes referred to collectively hereinbelow as "Defendants."

## MATERIAL FACTS

### Defendant PASSBASE Hires Plaintiff at a Salary Far Less Than Her Market Worth, and at a Lower Salary Than Comparable Positions in the Industry

19.     At the time of her hiring by Defendant PASSBASE, Ms. Mwangi had impressive experience in the Regtech space, with over ten years of experience in the Data Privacy sector, including her most recent position of nearly five years in global strategic partnerships at competitor identity verification company named Trulioo Global Gateway.

20.     The Company's "Founding Team" -- including Defendant MCGIBBON, former COO and present CEO; Felix Gerlach ("Mr. Gerlach"), former Vice President of Products and present CPO; and Defendant KLENK, former CEO and present CTO --

4

interviewed Ms. Mwangi and hired her for the position of Strategic Partnerships Lead in October 2019.

21.     After prolonged negotiations wherein Defendant PASSBASE's Founding Team attempted to acquire Ms. Mwangi's professional services at a below market rate of compensation, she and the Company agreed that Ms. Mwangi's employment wasto proceed through a 90-day probationary period with a start date of October 31, 2019, during which period Ms. Mwangi would earn a total of $24,000 in compensation. Ms. Mwangi and Defendant PASSBASE executed a "Consulting Agreement" to this effect, a correct and complete copy of which is annexed hereto as Exhibit B.

22.     During their salary negotiations, Defendant MCGIBBON proffered the following troubling reasoning as to why the Company was not willing to pay Plaintiff a higher salary: "It's not nearly what you asked for, or frankly what you're worth, but circumstances made creating a Berlin role of that value impossible. We would have mutiny on our hands if we paid you more." The implication being that the all-Caucasian senior executive team could not countenance a woman of color earning a salary commensurate to theirs.

23.     In February 2020, Defendant PASSBASE renewed the employment agreement with Ms. Mwangi as the Strategic Partnerships Lead for an additional two-year term, which was to end on February 12, 2022. Under this employment agreement, Ms. Mwangi was to be compensated at a rate of $7,500 per month, i.e., $90,000 in annual salary. Ms. Mwangi and Defendant PASSBASE executed a new "Consulting Agreement" to this effect, a correct and complete copy of which is annexed hereto as Exhibit C.

24.     Plaintiff's responsibilities as a Strategic Partnerships Lead included: (i) drive distribution and revenue growth of Defendant PASSBASE's platform; (ii) improve

product performance and scope with technical partners, and procurement of third-party databases capable of extending Defendant PASSBASE's product capacity; and (iii) foster industry alliances to increase trust and system importance in the industry. As her presence at Defendant PASSBASE grew, Plaintiff was additionally expected take on the responsibilities of Head of Compliance, including supporting the internal customer-facing organization regarding direct customer communications regarding any regulatory compliance issues at Defendant PASSBASE. Upon information and belief, Plaintiff was additionally assigned this role after executing the "Consulting Agreement" to bridge an existing knowledge gap at the Company; indeed, upon information and belief, Plaintiff was the only senior executive team member at Defendant PASSBASE with any regulatory experience from the time of her hire, until in or about May 2021.

25.     Beginning in March 2021, Jenna Bachrouche ("Ms. Bachrouche") became Defendant PASSBASE's Head of Human Resources ("HR"), Talent, and People. Previously, Defendant MCGIBBON acted as the Company's HR Director.

26.     At all times material to this complaint, Defendant MCGIBBON was Plaintiff's direct supervisor. Beginning in March 2021, Defendant MCGIBBON held the title of CEO, while prior to that he was the COO.

27.     Beginning in March 2021, Defendant KLENK held the title of CTO. Previously, he was the CEO.

28.     In their respective positions, Defendants MCGIBBON and KLENK each had sufficient authority to affect the conditions and status of Plaintiff's employment with the Company.

29.     Prior to her official "annual review" in March 2021, Ms. Mwangi received nothing but praise from Defendants regarding her work at Defendant PASSBASE.

**Early in 2020, Plaintiff Assumes the Additional Role of Head of Compliance for Defendant PASSBASE to Fill a Marked Void in the Company's Regulatory Infrastructure and, as She Asserts Her Authority, She Is Met with Racists and Sexist Hostility by Members of the Founding Team**

30.     By January 2020, it became clear to Plaintiff that no one at Defendant PASSBASE was closely overseeing regulatory compliance at the Company and that Defendant PASSBASE would not be able pass due diligence checks by its potential strategic partners. For example, during 2020 Defendant PASSBASE failed to pass due diligence checks by potential strategic partners such as Wunder Mobility and Mambu Composable Banking.

31.     Accordingly, first on her own initiative and later with the support of the Founding Team, Ms. Mwangi began to interface with the compliance and regulatory officers of Defendant PASSBASE's existing and potential clients in the first quarter of 2020.

32.     In or about July 2020, Plaintiff was given the title of Head of Compliance by the Founding Team but was not afforded any additional compensation for undertaking that important role. Upon information and belief Caucasian male senior executives at Defendant PASSBASE were afforded additional compensation for undertaking important additional roles during their employment at Defendant PASSBASE.

33.     During the fourth quarter of 2020. Defendant MCGIBBON confirmed to Head of Security, Alan Zanatta, that Plaintiff was to be listed as the Head of Compliance on all audit applications (ISO/IEC 27001) submitted to the International Organization Standardization (ISO) and the International Electrotechnical Commission (IEC), which form

7

the specialized system for worldwide standardization in the field of information technology ("IT"); indeed, the ISO and IEC have established a joint technical committee (the "ISO/IEC") to oversee the terms and definitions commonly used by information security management systems ("ISMS").

34.     Upon information and belief, by December 2020 -- despite Plaintiff's best efforts -- Defendant PASSBASE had experienced numerous security breaches, including one in which personally identifiable information (such as biometric images used by facial recognition platforms) from data subjects – i.e., clients' end-users -- was inadvertently shared for download without requisite end-user consent. This security breach required Plaintiff to undertake a client-wide clean-up operation to make certain that the unauthorized personal biometric data of its clients' end-users remained secure and was not inappropriately released.

35.     Remarkably, although Plaintiff secured this potential data breach for Ramp Swaps Ltd. ("Ramp") – upon information and belief currently Defendant PASSBASE's largest client – she was later criticized by Defendant MCGIBBON for allegedly being "perceived as aggressive" by Ramp because of her "tone." Whether Defendant MCGIBBON was true or false (and therefore pretextual) in his attribution of this racially tinged and sexist sounding statement to Ramp remains to be determined at trial. It can be stated with certainty, however,that the statement was unlawful no matter who said it.

**Defendants Learn Plaintiff is Subjected to Sexual Harassment and/or a**

**Hostile Work Environment by Andrei Strugaru, Yet Take No Remedial Action**

36.     During a taxicab ride on October 16, 2020, that Plaintiff shared with Andrei Strugaru ("Mr. Strugaru"), VP of Engineering; Nicholas Brugneaux ("Mr. Brugneaux"), Lead Backend Engineer; and Mr. Gerlach after attending a Company event,

Mr. Strugaru directed the following sexist remark towards Plaintiff: ***"women belong in the kitchen, because men don't do a good job there."*** This disturbing comment was unsolicited and in direct response to a separate conversation Ms. Mwangi was having with Mr. Brugneaux, in which Plaintiff was praising Mr. Brugneaux's culinary skills. Both Mr. Brugneaux and Plaintiff were flabbergasted by Mr. Strugaru's sexist remark and continued their conversation without acknowledging him.

37.     Prior to this, on March 8, 2020, during one of their very first interactions, Mr. Strugaru had offensively and suggestively asked Plaintiff for the name of the perfume she was wearing, so that he could "buy it for … [his] wife."

38.     On October 16, 2020, Ms. Mwangi informed Ms. Bachrouche of the sexist comments Mr. Strugaru had made to Plaintiff earlier that day. Ms. Bachrouche then set up a meeting that was to include herself, Plaintiff, and another employee at Defendant PASSBASE named Emily Brenner ("Ms. Brenner"), a consultant with whom Plaintiff had never interacted, to discuss the sexual harassment each was experiencing at the hands of Mr. Strugaru. Surprisingly, Ms. Brenner did not attend the meeting that Ms. Bachrouche scheduled for October 20, 2020.

39.     After the meeting, Ms. Bachrouche informed Defendant KLENK of Plaintiff's complaint of sexism and sexual harassment in the workplace.  On October 29, 2020, Defendant KLENK discussed the issue with Ms. Mwangi during a previously scheduled meeting. Rather than taking Plaintiff's complaint of sexual harassment seriously, Defendant KLENK laughed uncomfortably during the meeting and, in a ham-handed attempt to excuse Mr. Strugaru's sexist remarks, informed Ms. Mwangi that "Andrei meant it as a compliment," with Defendant KLENK also asserting that he "didn't want to deal in hearsay."  Plaintiff noted

to Defendant KLENK that both Messrs. Brugneaux and Gerlach were in the car during the exchange in question, should he wish to corroborate the information and not "deal in hearsay," as Defendant KLENK had suggested.  Nevertheless,  no  further  action  was  ever taken regarding Ms. Mwangi's October 16, 2020, complaint of sexist behavior and sexual harassment in the workplace.

40.     On December 23, 2020, Defendant MCGIBBON evasively extolled to Plaintiff "after what we've done for you" in a reactionary response to Plaintiff's complaints about Mr. Strugaru, even though Plaintiff's concerns about sexism and sexual harassment had never been taken seriously or investigated by Defendant PASSBASE.

41.     By February 25, 2021, Mr. Strugaru's behavior at Defendant PASSBASE had become so problematic that the Head of HR, Talent, and People, Ms. Bachrouche, confided to Plaintiff over private Slack communications – and later in a regularly scheduled bi-weekly meeting on March 4, 2021 – that Ms. Bachrouche had to "go around" Mr. Strugaru in her recruiting efforts for the Engineering team, especially because he "had made concerning racist remarks about South Indians in the recruiting funnel." Earlier, on February 25, 2021, during a "Women at PASSBASE" meeting, Honelyn Go ("Ms. Go"), who was  the  only  female Engineer at Defendant PASSBASE, described an incident that she believed was sexist, in which a male colleague had forced her to publicly apologize for something in a way that – upon information and belief – she felt was discriminatory and belittling.

42.     Plaintiff communicated to Ms. Bachrouche later that day via Slack that Plaintiff  believed the colleague Ms.  Go may have  been referring  to in  her  comments was Mr. Strugaru, as he had previously treated Plaintiff in a similarly sexist manner. Ms.

Mwangi also discussed with Ms. Bachrouche how a lack of accountability in addressing Mr. Strugaru's behavior could be a reason why the offensive conduct was continuing and affecting most, if not all, of the (albeit few) female employees at Defendant PASSBASE. In response, Ms. Bachrouche stated that the Founding Team of Defendant PASSBASE were "finally starting to get it."

43.     Upon hearing Ms. Bachrouche's comment, Plaintiff was greatly shocked and especially troubled to realize the level of insignificance with which Defendant PASSBASE was treating the complaints of at least three separate women, over a period of at least five months, regarding Mr. Strugaru's sexist and harassing behavior.

44.     Meanwhile, Ms. Mwangi also experienced male and Caucasian coworkers, including Mr. Strugaru, actively block her from being able to contribute ideas by cutting her out of decision-making processes or going "above" her when she made a decision that did not align with their opinions.

45.     In one such incident, PASSSBASE held a Company-wide meeting regarding corporate culture. This meeting was called to discuss appropriate corporate culture for public channels following an incident in which a violent image or "meme" (of a man being beaten with batons by three other men, while the victim lays prostrate on the ground next to a journalist documenting the vicious beating, and a police officer in riot gear stands idly by, observing the mayhem) was posted to a Slack channel by a Caucasian male colleague.  During this meeting, various male colleagues, including members of the Founding Team, began chastising Ms. Mwangi for "publicly shaming" the colleague who had posted the image because she had asked him to remove it.

46.      Plaintiff found this behavior to be sexist, racially insensitive, and offensive, especially since it was entirely reasonable for Plaintiff to ask that the offensive imagery be removed. Adding insult to injury, the day after the incident, but prior to the Company-wide meeting, Defendant KLENK mockingly implied that he had "deliberated" whether to post a "meme" that depicted a house on fire – more offensive imagery for a woman ofcolor cognizant of the horrific history of racial violence in United States – "because it also shows violence." Further, Plaintiff and her female colleague, Ms. Bachrouche, were castigatedfor an hour during the aforementioned meeting, simply for escalating the issue. As a result ofthese stressful events, Plaintiff developed stress-induced symptoms related to her medical diagnosis of fibroid tumors -- a diagnosis of which Defendants were aware. For example, Plaintiff's feet were so swollen she could not put on shoes, and she was in so much back and upper body pain she could barely sit up.

**Beginning in December 2020, Despite Having Recently Been Hired into a Leadership Role Herself, Plaintiff Discovers That She Was Systematically Excluded from Blog Posts Authored by Defendant KLENK and Ms. Bachrouche, Which Were Designed to Acknowledge and Celebrate Key New Hires at Defendant PASSBASE**

47.      On December 17, 2020, Defendant KLENK authored a public-facing blog post entitled: "2020 A Year in Review," the purpose of which was to acknowledge and celebrate new key hires at Defendant PASSBASE. Specifically, under a section entitled "Doubling Our Talent and Opportunities," Defendant KLENK named every single key hire Defendant PASSBASE had made in the past year, including VP of Sales, Dan Lee ("Mr. Lee"); VP of Products, Sidney Francois ("Mr. Francois"); VP of Engineering, Mr. Strugaru; Head of People and HR, Ms. Bachrouche; and Solutions Engineer,

Amanda Gorfine ("Ms. Gorfine").  Shockingly, despite having officially joined

Defendant PASSBASE as the Lead of Strategic Partnerships in February of 2020, Plaintiff

was nowhere to be found in Defendant's review. Indeed, Plaintiff — the only Black woman

working at Defendant PASSBASE — was the only 2020 "key hire" excluded from the blog

post.

48.      On January 22, 2021, in her supposedly diversity-minded blog post: "It's

2021. Diversity cannot stay reactive," Defendant PASSBASE's Head of HR, Ms.

Bachrouche, doubled down on Defendant KLENK's earlier dismissiveness towards

Plaintiff's accomplishments by stating: ***"coming into a company led by straight, white***

***men where there was no presence of a woman in a senior leadership, or managerial***

***role, was a moment for pause"*** (emphasis added). Indeed, it appears that everyone (but

Plaintiff) was aware that despite the scope of her responsibilities and level of expertise at

Defendant PASSBASE, Plaintiff was not considered to be part of the senior leadership team

at the Company.

## Defendants Subject Plaintiff to Further Discrimination and Retaliation Based on Her Race and Gender

49.      During her first annual review with the Company, on March 18, 2021,

Plaintiff was shocked to learn that, despite her being an exceptional and overachieving

employee, Defendant MCGIBBON offered the following offensive feedback regarding her

"tone" when interacting with clients. Specifically, Defendant MCGIBBON stated that

Plaintiff's tone "has been perceived as aggressive by the receiver." This assessment was

extremely distressing to Plaintiff, not only given its abhorrent racist undertones, but also

because Plaintiff had never received any such feedback from Defendant MCGIBBON at

any time prior to this review, including during their weekly on-on-one meetings. Defendant MCGIBBON went on in the review to state: "I think we can understand/improve this by using something akin to the 'radical candor' framework. Being direct is great, but we need to make sure things are communicated with empathy, especially when she is right." The term "radical candor framework" in Defendant MCGIBBON's statement referred to a pictograph he included with his message, annexed as Exhibit D, regarding Plaintiff's tone. Shockingly, this diagram depicts the opposite of "radical candor" as **obnoxious aggression."**

50.     Offended by the racist undertones of Defendant MCGIBBON's comment, on March 18, 2021, Plaintiff notified Ms. Bachrouche over private Slack communications about the use of the term "aggressive" being a racist dog whistle. In response,Ms. Bachrouche asked for Plaintiff's consent to inform Defendant MCGIBBON of the problematic language he had used, with the aim of "finding a better mode for [Defendant MCGIBBON] to communicate his feedback." Subsequently, on March 18, 2021, Defendant MCGIBBON apologized to Plaintiff, but on the very next day, March 19, 2021, Defendant MCGIBBON re-assumed his campaign of racist language against Plaintiff, calling her "skeptical" in an email exchange regarding the initial feedback. At this point, it became clearto Plaintiff that her concerns regarding bias, discrimination, and retaliation at Defendant PASSBASE were not being taken seriously, as Defendant MCGIBBON was now fully awareof the pernicious implications associated with his chosen language yet did nothing to alter hisproblematic behavior.

**After Plaintiff Expresses Clear Opposition to the Discriminatory Conduct of Defendants, She Experiences Unlawful Retaliation in the Form of Continued**

14

**Unlawful Discrimination, Unlawful Termination of Her Contract, and Career**

**Derailment**

51.      Beginning in late 2020, Plaintiff reported the harassment and discrimination she had been experiencing to numerous members of Defendant PASSBASE's Founding Team, including Defendant MCGIBBON (CEO), Defendant KLENK (CTO), and Ms. Bachrouche (Head of HR).

52.      Following her annual review in March 2021, Plaintiff further complained to Defendant MCGIBBON and Ms. Bachrouche about racial discrimination she was experiencing at Defendant PASSBASE.

53.      On May 19, 2021, absolutely dejected and dismayed after having heard nothing for approximately two months following her complaints of discrimination in her March 2021 review, Plaintiff sent a letter to Ms. Bachrouche exploring the possibility of ending Ms. Mwangi's employment contract in December 2021 -- rather than in February 2022 as originally contemplated by the employment agreement. Showing remarkable professionalism, grace, and poise, Plaintiff made clear that she was providing for a "long lead time…to ensure that all priorities committed to are accounted for, as well as any other urgent business Passbase shall want to incorporate over the next two quarters can be sufficiently addressed," despite her extreme dismay about the discriminatory and retaliatory treatment she was suffering at the hands of Defendants.

54.      Thereafter, on June 21, 2021, Tonianne Florentino of Florentino and Grimshaw, LLC informed Plaintiff that her firm had been retained by the Advisory Board of Defendant PASSBASE to conduct an external investigation into the concerns raised by Plaintiff.

55.      Shockingly, following Plaintiff's March 2021 complaint regarding discrimination and retaliation, and completely ignoring her May 2021 letter, Defendant PASSBASE further derailed Ms. Mwangi's career by notifying her approximately one-and-one-half months later, on July 1, 2021, that they intended to terminate her "Consulting Agreement," which was to end in February 2022, prematurely on July 31, 2021.

56.      On July 1, 2021, Plaintiff forwarded a statement to Ms. Florentino which detailed her previously documented complaints of Defendants' unlawful conduct. To date, no one has informed Plaintiff regarding the findings of said investigation, nor, upon information and belief, have Defendants taken any remedial action to address Plaintiff's concerns.

57.      Indeed, on July 30, 2021, Ms. Florentino rejected Ms. Mwangi's request for an update on the findings of her investigation by stating that "any communications relating to investigation findings are provided only to the Passbase [Advisory] Board." To date, no one from either Defendant PASSBASE's Advisory Board or Founding Team has informed Ms. Mwangi of any investigatory findings.

58.      On July 29, 2021, Plaintiff again complained to Defendant PASSBASE's investigative agent about the unlawful conduct she has suffered while employed by Defendant PASSBASE.

59.      On July 31, 2021, Plaintiff's employment with Defendant PASSBASE was unilaterally terminated by Defendants.

60.      Defendant PASSBASE's premature termination of Plaintiff's "Consulting Agreement" was clearly in retaliation for Plaintiff's opposition to unlawful discrimination as well as a breach of her employment agreement.

**Damages Caused by Defendants' Unlawful Discrimination and Retaliation**

61.      As a result of the wanton discrimination and retaliation she has experienced while employed by Defendant PASSBASE, Plaintiff has suffered stress-induced outbreaks relating to underlying medical issues, including fibroid tumors. Additionally, Plaintiff's friends and family have noticed a change in Plaintiff's usual upbeat, bubbly personality and have told her they do not recognize her anymore.

62.      Plaintiff has been unlawfully discriminated and retaliated against, humiliated, and degraded, and as a result, suffered loss of rights, emotional distress, pay disparity, and lost wages.

63.      Plaintiff's contract has been terminated prior to the expiration of its term as a result of unlawful discrimination and retaliation.

64.      As a result of Defendants' actions, Plaintiff feels extremely degraded, victimized, embarrassed, and emotionally distressed.

### AS A FIRST CAUSE OF ACTION FOR
### DISCRIMINATION AND RETALIATION UNDER 42 U.S.C. SECTION 1981
### (Against All Defendants)

65.      Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

66.      Pursuant to 42 U.S.C. § 1981: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and should all be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind and to no other."

67.     Defendants engaged in unlawful employment practices prohibited by 42

U.S.C. § 1981, by discriminating against Plaintiff because of her race (African American)

and color (Black), as well as retaliating against her for engaging in protected conduct.

68.     As a result of the acts and conduct complained of herein, Plaintiff has

suffered and will continue to suffer damages including but not limited to economic and

pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety,

pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and

special damages.

69.     Accordingly, as a result of the unlawful conduct of Defendants, Plaintiff has

been damaged as set    forth herein and is entitled to the maximum compensation

available under this law.

### AS A SECOND CAUSE OF ACTION FOR
### AIDING AND ABETTING UNDER THE
### NEW YORK STATE HUMAN RIGHTS LAW
### (Against All Defendants)

70.     Plaintiff repeats and realleges each and every allegation made in the above

paragraphs of this complaint as if fully set forth herein.

71.     New York State Executive Law § 296 provides that:

i) It shall be an unlawful discriminatory practice: For an employer

or licensing agency, because of an individual's age, race, creed,

color, national origin, sexual orientation, military status, sex,

disability, predisposing genetic characteristics, marital status, or

domestic violence victim status, to refuse to hire or employ or to bar

or to discharge from employment such individual or to discriminate

against such individual in compensation or in terms, conditions or privileges of employment."

a) It shall be an unlawful discriminatory practice for any person engaged in any activity to which this section applies to retaliate or discriminate against any person because he or she has opposed any practices forbidden under this article or because he or she has filed a complaint, testified, or assisted in any proceeding under this article.

72.     Defendants engaged in an unlawful discriminatory practice by retaliating against Plaintiff for opposing practices forbidden under the New York State Human Rights Law.

73.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damage including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

74.     Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

**AS A THIRD CAUSE OF ACTION FOR**
**AIDING AND ABETTING UNDER THE**
**NEW YORK STATE HUMAN RIGHTS LAW**
**(Against Defendants KLENK and MCGIBBON Only)**

75.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of the complaint as if fully set forth herein.

19

76.     New York State Executive Law § 296(6) provides that it shall be an unlawful discriminatory practice: "For any person to aid, abet, incite compel or coerce the doing of any acts forbidden under this article, or attempt to do so."

77.     Defendants KLENK and MCGIBBON engaged in an unlawful discriminatory practice in violation of New York State Executive Law § 296(6) by aiding, abetting, inciting, compelling, and coercing the discriminatory conduct against Plaintiff.

78.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

79.     Accordingly, as a result of Defendant KLENK and Defendant MCGIBBON's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## AS A FOURTH CAUSE OF ACTION FOR
## DISCRIMINATION AND RETALIATION UNDER THE
## NEW YORK CITY HUMAN RIGHTS LAW
## (Against All Defendants)

80.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

81.     New York City Administrative Code § 8-107 provides that:

a)  It shall be an unlawful discriminatory practice: For an employer or an employee or agent thereof, because of the actual or perceived age, race, creed, color, national origin, gender, disability, marital status, sexual orientation or alienage or citizenship status of any person, to refuse to hire or employ or to

bar or to discharge from employment such person or to discriminate against such person in compensation or in terms, conditions, or privileges of employment.

b) It shall be unlawful discriminatory practice: For an employer […] to discriminate against any person because such person has opposed any practices forbidden under this chapter […]

82.     Defendants engaged in an unlawful discriminatory practice by discriminating against Plaintiff because of her race (African American) and color (Black).

83.     Defendants engaged in an unlawful discriminatory practice by retaliating against Plaintiff for opposing practices forbidden under the New York City Human Rights Law.

84.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

85.     Accordingly, as a result of Defendants' unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

### AS A FIFTH CAUSE OF ACTION FOR AIDING AND ABETTING UNDER THE NEW YORK CITY HUMAN RIGHTS LAW (Against Defendants KLENK and MCGIBBON Only)

86.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

87.     The New York City Administrative Code § 8-107(6) provides that it shall be unlawful discriminatory practice "for any person to aid, abet, incite, compel or coerce the doing of any of the acts forbidden under this chapter, or attempt to do so."

88.     Defendants KLENK and MCGIBBON engaged in an unlawful discriminatory practice in violation of New York City Administrative Code § 8-107(6) by aiding, abetting, inciting, compelling, and coercing the above discriminatory, unlawful, and retaliatory conduct.

89.     As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages including but not limited to economic and pecuniary losses; severe emotional, psychological, and physical stress, distress, anxiety, pain and suffering; the inability to enjoy life's pleasures; and other non-pecuniary losses and special damages.

90.     Accordingly, as a result of Defendant KLENK and Defendant MCGIBBON's unlawful conduct, Plaintiff has been damaged as set forth herein and is entitled to the maximum compensation available under this law.

## AS A SIXTH CAUSE OF ACTION FOR
## BREACH OF CONTRACT
### (Against Defendant PASSBASE Only)

91.     Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this complaint as if fully set forth herein.

92.     Plaintiff having entered into a legally cognizable agreement of employment with Defendant PASSBASE, after negotiating at arms' length and reaching a meeting of the minds as to scope, term, and sufficient consideration, only to suffer Defendant PASSBASE's breach of the employment agreement by means of unlawful termination is duly aggrieved.

93.     Under the terms of the employment agreement, as the non-breaching party, only Plaintiff – not Defendant PASSBASE – can unilaterally terminate the contractual relationship.

94.     Therefore, the Notice of Termination issued by Defendant PASSBASE to Plaintiff on July 1, 2021, is defective, null, and void.

95.     Accordingly, as a result of Defendant PASSBASE's unlawful conduct, Plaintiff has suffered damages that proximately flow from Defendant PASSBASE's breach in an amount to be determined at trial.

96.     Moreover, Defendant seeks specific performance of the employment agreement through reinstatement for its term.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendants:

A. Declaring that Defendants engaged in, and enjoining Defendants from continuing to engage in, unlawful employment practices prohibited by Section 1981 of the Civil Rights Act of 1866, 42 U.S.C. § 1981; and the New York State Human Rights Law, New York State Executive Law, §§ 296, *et. seq.*, and the New York City Administrative Code §§ 8-107, *et. seq.,* in that Defendants discriminated against Plaintiff based on herrace (African American), color (Black), and gender (female), and retaliated against Plaintiff;

B. Ordering Defendant PASSBASE to reinstate Plaintiff and employ her through February 10, 2022, as specific performance under the operative employment agreement;

C. Awarding damages to Plaintiff for denial of equal pay and bonuses resulting from Defendant's unlawful discrimination and retaliation and to otherwise make her whole for any losses suffered as a result of such unlawful employment practices;

D. Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering and injury to her reputation in an amount to be proven at trial;

E. Awarding Plaintiff punitive damages;

F. Awarding Plaintiff attorney's fees, costs, disbursements, and expenses incurred in the prosecution of this action; and

G. Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy the Defendants' unlawful employment practices against her.


Dated:　　　　White Plains, New York
　　　　　　　August 10, 2021

　　　　　　　　　　　　　　　Parisis G. Filippatos
　　　　　　　　　　　　　　　**FILIPPATOS PLLC**
　　　　　　　　　　　　　　　*Attorney for Plaintiff*
　　　　　　　　　　　　　　　199 Main Street, Suite 800
　　　　　　　　　　　　　　　White Plains, NY 10601
　　　　　　　　　　　　　　　Tel: 914-984-1111
　　　　　　　　　　　　　　　Fax: 914-984-1111
　　　　　　　　　　　　　　　pgf@filippatoslaw.com

　　　　　　　　　　　　　By:　/s/ Parisis G. Filippatos
　　　　　　　　　　　　　　　　Parisis G. Filippatos (PF-1593)