UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

ROSE WANJUGU MWANGI,

                Plaintiff,

– against –

PASSBASE, INC., MATHIAS KLENK, *and* DAVID MCGIBBON,

                Defendants.

**OPINION & ORDER**

21 Civ. 6728 (ER)

RAMOS, D.J.:

Rose Wanjugu Mwangi filed this action on August 10, 2021 against her former employer, Passbase, Inc., and two of its officers, Mathias Klenk and David McGibbon, alleging that they subjected her to racial and sex discrimination, a hostile work environment, wrongful termination, and retaliation in violation of federal and state law. Doc. 1.

Defendants initially filed a motion to dismiss the complaint on November 19, 2021. Doc. 22. In response, Mwangi amended the complaint on December 10, 2021. Doc. 26. On January 19, 2022, defendants filed a motion to dismiss the amended complaint pursuant to F.R.C.P. 12(b)(6) for failure to state a claim. Doc. 36. For the reasons set forth below, the motion to dismiss is GRANTED.[1]

### I. BACKGROUND

The following facts are based on the allegations in the complaint, which the Court accepts as true for purposes of the instant motion. *See, e.g., Koch v. Christie's Int'l PLC*, 699 F. 3d 141, 145 (2d Cir. 2012).

---

[1] Defendants' initial motion to dismiss, Doc. 22, is now denied as moot.

Mwangi is an African American citizen of the United States who at all relevant times lived in Berlin, Germany. Doc. 26 ¶¶ 10–11. She had worked in the "Regtech" industry (regulatory work for technology companies) for over ten years, and contracted to work for Passbase, a start-up identity verification company, starting on October 31, 2019, as a Strategic Partnerships Lead. *Id.* ¶¶ 1, 18–19. The terms of her initial contract required that she work 90 days starting on October 31, 2019, with a compensation of $24,000. *Id.* ¶ 20. Then, after significant negotiations in which Mwangi claims defendants acted discriminatorily, Mwangi signed a two-year contract on February 12, 2020, with a starting date of February 10, 2020 and at a salary of $7,500 per month. *Id.* ¶¶ 22–23; Doc. 26-4 § 3.1. Mwangi alleges that along with this contract, there was "the understanding" that she would move to New York to work in Passbase's office, though she did not do so because of COVID-19. Doc. 40 at 1–2. Her contract was termed a "Consulting Agreement," and designated her as a resident of California. Doc. 26 ¶¶ 21, 62. It also explicitly stated that she was an independent contractor. Doc. 26-3 § 9. The agreement required that she "(i) drive distribution and revenue growth of [Passbase's] platform; (ii) improve product performance and scope with technical partners, and procurement of third-party databases capable of extending [Passbase's] product capacity; and (iii) foster industry alliances to increase trust and system importance in the industry." Doc. 26 ¶ 25. She later was officially given the additional role of head of compliance in July of 2020, after doing some compliance work for the company in the first quarter of 2020, for which she was required to "support[] the internal customer-facing organization regarding direct customer communications regarding any regulatory compliance issues" and manage the effects of security breaches. *Id.* ¶¶ 25, 37–38, 40.

Passbase's offices are in New York City. Its officers, including Klenk and McGibbon, live and work there, too. *Id.* ¶¶ 12, 15–16. For the entirety of Mwangi's stint at the company, she was operating virtually from Berlin, though she maintains bank accounts and a physical address in California. *Id.* ¶ 35. During her time at Passbase, Mwangi was subject to multiple incidents that she alleges were racist, sexist, or both. *Id.* ¶ 1, 4–5. The discrimination she alleges is wide-ranging. It includes being paid at a lower salary than her market worth and not receiving increased compensation when she was given the additional title of head of compliance. It also includes statements by Mr. Strugaru, a coworker, "suggestively" asking the name of Mwangi's perfume on March 8, 2020 so he could buy it for his wife, and about women belonging "in the kitchen," which occurred while Mwangi was in a taxicab with him on October 16, 2020. *Id.* ¶¶ 42–43. Mwangi alleges that Klenk dismissed her complaints regarding this comment as hearsay on October 9, 2020. *Id.* ¶ 45. The alleged discrimination further included being told by McGibbon that her tone when interacting with a client was "perceived as aggressive," and being chastised for denouncing a violent "meme" shared by a white male colleague. *Id.* ¶¶ 6, 41, 51. She alleges that white male colleagues frequently cut her out of the decision-making process. *Id.* ¶ 50. Mwangi claims that McGibbon responded to her complaint about Strugaru by saying "after what we've done for you!" on December 23, 2020, and that this comment demonstrated that he did not believe these acts warranted any meaningful response. *Id.* ¶ 46.

Mwangi also alleges that she was discriminatorily left out of public-facing documents about key leadership roles at the company written and published by Klenk on December 17, 2020, and that in addition to saying she was perceived as aggressive, McGibbon shared a graph which suggested that she acted with "obnoxious aggression" and gave her an unwarranted negative performance review on March 18, 2021. *Id.* ¶¶ 54, 56; Doc. 26-5. While she informed

the head of Human Resources of this on the same day the performance review occurred, it was clear to her by the next day, when McGibbon called her "skeptical," that little to no action would be taken. Doc. 26 ¶ 56. Ultimately, Mwangi decided to end her contract early, in December of 2021 as opposed to February of 2022, and notified the head of Human Resources of her intent to do so on May 19, 2021. *Id.* ¶ 60. However, before she was able to leave of her own accord, Passbase terminated her contract prematurely, notifying her on July 1, 2021 that she would be terminated 30 days later. *Id*. ¶ 62.

Mwangi first lodged a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 18, 2021, and received a notice of right to sue 42 days later, which said that although "[l]ess than 180 days [the statutory period for investigation] ha[d] passed since the filing of this charge," the EEOC would not "be able to complete its administrative processing of this charge within 180 days," and allowed her to sue on her own. *Id.* ¶ 9; Doc. 26-1. She filed the instant complaint with this Court, alleging violations of 42 U.S.C. § 1981, Title VII, and the New York City and New York State Human Rights Laws, as well as a breach of contract. Doc. 26 ¶¶ 74–108. Defendants now move to dismiss the complaint in its entirety, on the basis that Mwangi's right to sue letter was invalid, that she was an independent contractor and thus not covered by Title VII, that she was not in New York or the United States for the relevant period and thus is not covered by the § 1981, Title VII, or the New York City and New York State Human Rights Laws, and that their contract was not breached.

## II.   LEGAL STANDARD

When ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Christie's Int'l PLC*, 699 F.3d at 145. However, the Court is not required to credit "mere

conclusory statements" or "[t]hreadbare recitals of the elements of a cause of action." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)); *see also id.* at 681 (citing *Twombly*, 550 U.S. at 551). "To survive a motion to dismiss, a complaint must contain sufficient factual matter . . . to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting *Twombly*, 550 U.S. at 570). A claim is facially plausible "when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). More specifically, the plaintiff must allege sufficient facts to show "more than a sheer possibility that a defendant has acted unlawfully." *Id.* If the plaintiff has not "nudged [her] claims across the line from conceivable to plausible, [the] complaint must be dismissed." *Twombly*, 550 U.S. at 570.

### III. DISCUSSION

#### A. § 1981 Claims

The relevant language of § 1981 states that "all persons *within the jurisdiction of the United States* shall have the same right in every state and territory . . . to make and enforce contracts." 42 U.S.C. § 1981 (emphasis added). Accordingly, the question the Court must address is whether Mwangi was within the jurisdiction of the United States when the events occurred, such that she may make a valid § 1981 claim. The Court holds that she was not. While Mwangi is a United States citizen, and the defendants were in the United States at the time of the alleged incidents, this does not compel the conclusion that § 1981 applies to this case. The Second Circuit has addressed the issue of extraterritorial application of § 1981 directly, holding that "the 'language' of Section 1981 unambiguously confirms [that it does not] reach discrimination against individuals outside the territor[y]" of the United States. *Ofori-Tenkorang v. Am. Int'l Group, Inc.*, 460 F.3d 296, 301 (2d Cir. 2006). *Ofori-Tenkorang* dealt with a § 1981

claim brought by a Black plaintiff who had been employed by AIG in Connecticut and was transferred to South Africa. *Id*. at 299. He alleged that both before and after the transfer, he was treated discriminatorily with regards to office assignment and expense reimbursement and was given harsher performance reviews and smaller bonuses. *Id*. The court held that the claims arising from conduct that occurred after his transfer to South Africa must be dismissed for two reasons. First, the plain meaning of the text of § 1981 unambiguously refers only to the jurisdiction of the United States and subdivisions within its borders, confirming the "legal presumption that Congress ordinarily intends its statutes to have domestic, not extraterritorial, application." *Id.* at 301. Second, the legislative history makes clear that § 1981 was not meant to apply to those who are physically outside of the United States when an alleged discriminatory act takes place, since it was part of Reconstruction-era legislation meant to "ensure that [formerly enslaved people] retained . . . basic rights." *Id*. Because of the text and legislative history of § 1981, the court concluded "that Congress has not extended the coverage of Section 1981 beyond the territorial jurisdiction of the United States." *Id*. at 298.

There is no dispute that Mwangi was not in the country when the alleged discrimination took place — and was never within the country during the relevant period, unlike Ofori-Tenkorang, who was initially hired and contracted to work in Connecticut. *Id*. at 299.

Still, Mwangi claims that *Ofori-Tenkorang* allows for claims to survive if a plaintiff "was within the jurisdiction of the U.S. during the formation of her employment contract, which ultimately proved to be riddled with discriminatory animus." Doc. 40 at 5. But the *Ofori-Tenkorang* addresses that specific circumstance as well, stating that it will not allow § 1981 claims "merely because the relevant employment contract was initially formed in the United States." 460 F.3d at 304. In any event, Mwangi was not in the United States during the

negotiation of her contract. As Mwangi herself states in her complaint, "[a]t all times relevant" to the complaint, she was a resident of Berlin, and "throughout the [contractual] negotiations . . . Mwangi . . . participated virtually" from that city. Doc. 26 ¶¶ 10, 19. While Mwangi was defined as a resident of California by the parties when they wrote the contract, she was in Berlin when this occurred. Doc. 40 at 7. Further, while Mwangi claims that the concept of being within a jurisdiction is complicated by the proliferation of remote work due to COVID-19, her employment contract was executed before the pandemic caused any shutdown — indeed, in October 2019 (when the contract was signed), the novel coronavirus had not yet been declared a pandemic. Doc. 26 ¶ 19. Even taking Mwangi's claims as true, she fails to state a claim upon which relief can be granted, and her § 1981 claims must be dismissed.

### B. Title VII Claims

#### a. Early Notice of Right to Sue

Title VII, as codified in 42 U.S.C. § 2000e-5(f)(1), sets out a 180-day maximum period for the EEOC to investigate a claim of discrimination. If by that point "the commission has not filed a civil action under this section . . . or the commission has not entered into a conciliation agreement . . . [it] shall so notify the person aggrieved," at which point they may sue independently. 42 U.S.C. § 2000e-5(f)(1). It does so by issuing a so-called right to sue letter. The commission issues these right to sue letters before the 180-day mark if it investigates and determines that "there is n[o] reasonable cause to believe that the charge is true." *Hernandez v. Premium Merch. Funding One, LLC*, No. 19 Civ. 1727 (WHP), 2020 WL 3962108, at *3 (S.D.N.Y. July 13, 2020) (citing 42 U.S.C. §§ 2000e-5(b)). However, it also has promulgated its own regulation, allowing it to issue an early right to sue letter if a "designated official from the EEOC 'has determined that it is probable that the Commission will be unable to complete its

7

administrative processing of the charge within 180 days from the filing of the charge and has attached a written certificate to that effect.'" *Id*. (citing 29 C.F.R. § 1601.28(a)(2)). Mwangi and Passbase disagree about whether the latter method is a legitimate basis on which a plaintiff can sue.

Mwangi, citing *Hernandez*, 2020 WL 3962108, and *Figueira v. Black Entertainment TV*, 944 F. Supp. 299 (S.D.N.Y. 1996), argues that the 180-day mark is a maximum, and that the EEOC is permitted to give notice of right to sue earlier, as it did in her case. Doc 40 at 9. In *Figueira*, the court found an employee who brought a pregnancy discrimination suit under Title VII was not barred from bringing suit after the EEOC issued a right to sue letter 15 days after the complaint was filed because, like here, it would be unable to complete its investigation within the full 180 days. It held that the EEOC's early issuance policy "is a reasonable regulation, not in conflict with the language or the purpose of Title VII, enacted pursuant to authority granted by Congress," and clarified that the "180-day period set forth in § 2000e-5(f)(1) is a statutory cut-off, [and the] EEOC is not barred from waiving its exclusive jurisdiction before expiration of the 180 days, if it believes that doing so will benefit claimants and facilitate the purposes of Title VII." *Figueira*, 944 F. Supp. at 304–05. *Hernandez* relied on this holding to allow the filing of Title VII gender-based discrimination claims pursuant to a right to sue letter that was given to Hernandez after 40 days. In that case, the EEOC issued the right to sue letter on the same basis, that it would not be able to complete a full investigation within 180 days. In addition to marshalling *Figueira*'s analysis, the court applied *Chevron*'s two-step deference analysis. In doing so, it found that "nothing in the statute [unambiguously] mandate[d] that the EEOC wait [the entire] 180 days," and that its regulation allowing early right to sue letters in the context of

this administrative impossibility was reasonable, as it was not "manifestly contrary to the statute." *Hernandez*, 2020 WL 3962108, at *15, *17–*18.

Defendants cite *Gibb v. Tapestry, Inc.*, No. 18 Civ. 6888 (LAP), 2018 WL 6329403, at *1 (S.D.N.Y. Dec. 3, 2018) to argue that the EEOC must wait the full statutory period before giving this notice, and that a litigant who receives notice and files suit before then has not exhausted all available administrative remedies, as Title VII requires.[2] Doc. 37 at 12–13. The Court finds Mwangi's argument based on *Hernandez* persuasive, and holds that receiving a right to sue letter before the expiration of the 180-day period on the basis of administrative convenience does not preclude her right to file suit upon receipt.

While the Second Circuit itself has not addressed this issue, other circuits have, and the majority of them agree that the EEOC appropriately adopted the regulation allowing it to issue right to sue letters prior to the expiration of 180 days on the basis of administrative convenience. *Compare Saulsbury v. Wismer & Becker, Inc.*, 644 F.2d 1251, 1257 (9th Cir. 1980) (holding that issuance of an early right to sue letter does not bar Title VII claims); *Walker v. United Parcel Serv., Inc.*, 240 F.3d 1268, 1275 (10th Cir. 2001) (same); *Sims v. Trus Joist MacMillan*, 22 F.3d 1059, 1061 (11th Cir. 1994) (same), *with Martini v. Fed. Nat.'l Mortg. Ass'n,* 178 F.3d 1336, 1347 (D.C. Cir. 1999) (barring a Title VII claim because the right to sue letter was issued before 180 days, using the same logic as *Gibb*). Courts in this District have also come to different decisions. *Compare Hernandez*, 2020 WL 3962108, *with Henschke v. New York Hospital-Cornell Medical Ctr.*, 821 F. Supp. 166, 170 (S.D.N.Y. 1993) (striking down a Title VII claim

---

[2] In *Gibb*, the Court held the plain language of § 2000e-5(f)(1) evinced a clear, exclusive mandate from Congress that the EEOC wait the entire 180 days before issuing a right to sue, and that Congress wanted to encourage resolution outside the courts within those 180 days. It thus found that the administrative convenience regulation was invalid, and that Gibb, who sued for sex discrimination under Title VII after receiving his right to sue letter seven days after filing with the EEOC, did not have a valid claim since his right to sue letter was issued based on that regulation.

because of an early right to sue letter using the same logic as *Gibb*). This Court is persuaded by the analysis of the majority of circuits and of *Hernandez*. First, the plain meaning of the statute does not preclude the EEOC's regulation allowing an early notice. It simply states that if one of two events occurs — the EEOC finds no probable cause and dismisses the case or the 180-day mark is reached without a suit being filed — the EEOC must issue the letter. This does not mean that these are the *only* two situations in which it can issue a right to sue; the "issuance of early right to sue notices[] does not conflict" with the language of the statute. *Hernandez*, 2020 WL 3962108, at *6 (citing *Nodelman v. Gruner & Jahr USA Pub.*, No. 98 Civ. 1231 (LMM), 2000 WL 502858, at *6 (S.D.N.Y. Apr. 26, 2000)).

Furthermore, as *Hernandez* highlights, Congress was concerned not only with not overburdening administrative agencies, but also with ensuring the rapid resolution of claims of discrimination when it enacted this law. *Hernandez*, 2020 WL 3962108, at *6 (quoting 42 U.S.C. § 2000e-5(b)'s requirement that the charge be managed as soon as possible, and citing *Figueira*'s similar discussion of the legislative history). Forcing Mwangi to wait 180 days before she can sue, simply because of a non-exhaustive list in the statute, would not accomplish either of these goals. While defendants claim that the EEOC did not make a thorough investigation of the claim and thus ought to have taken the entire 180 days before giving the right to sue, Doc. 37 at 15, Mwangi's notice explicitly stated that they had broadly "reviewed all of the circumstances" of the case and determined that issuing the notice was "warranted at this time" because it would not be able to investigate any further. Doc. 40 at 10. Formalistically abiding by this timeframe would not have served the goals of the commission or of Mwangi. Accordingly, Mwangi's Title VII claims are not invalid on that basis.

### b. Employee versus Independent Contractor Status

Defendants alternatively claim that Mwangi was, in fact, an independent contractor of Passbase, not an employee, and that Title VII therefore does not apply to her. Doc. 37 at 16. The Supreme Court announced a non-exhaustive list of factors to consider when determining whether a plaintiff is an employee or independent contractor in *Community for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989), which based its analysis on the common law of agency. They are as follows:

> (1) the hiring party's right to control the manner and means by which the product is accomplished; (2) the skill required; (3) the source of the instrumentalities and tools; (4) the location of the work; (5) the duration of the relationship between the parties; (6) whether the hiring party has the right to assign additional projects to the hired party; (7) the extent of the hired party's discretion over when and how long to work; (8) the method of payment; (9) the hired party's role in hiring and paying assistants; (10) whether the work is part of the regular business of the hiring party; (11) whether the hiring party is in business; (12) the provision of employee benefits; and (13) the tax treatment of the hired party.

Doc. 37 at 16–17 (citing *Davis v. N. New York Sports Officials' Council*, No. 09 Civ. 514 (GTS) (GHL), 2010 WL 3909688, at *6 (N.D.N.Y. Sept. 30, 2010) (citing *Reid*, 490 U.S. at 751–52))). Weighing these factors is a "fact-specific analysis," and certain factors can be more or less impactful on the final determination based on the circumstances. *Salamon v. Our Lady of Victory Hosp.*, 514 F.3d 217, 226 (2d Cir. 2008) (applying the *Reid* factors to a physician). The Court addresses each of these factors in turn, as Mwangi has advanced claims for each.

When balancing these factors, the "'greatest emphasis' should be placed on the first factor." *Eisenberg v. Advance Relocation & Storage, Inc.*, 237 F.3d 111, 114 (2d Cir. 2000) (citing *Frankel v. Bally, Inc.*, 987 F.2d 86, 90 (2d Cir. 1993)) (finding a worker hired by a warehouse to be an employee based on these factors, especially the first). Here, Mwangi fails to allege anything beyond conclusory statements stating that Passbase controlled the manner and

means of her work: Passbase, she claims, "exercised control over her," "trained [her] for her position," "set [her] work schedule," and "controlled the [virtual] location" where work was performed. Doc. 40 at 12–13. These claims are essentially mere "recitals of the elements of a cause of action." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555). Mwangi must allege specific facts that suggest a plausible claim that Passbase "controlled [her] day-to-day tasks," and she does not sufficiently do so. *Gallagher v. AEG Mgmt. Brooklyn, LLC*, No. 16 Civ. 4779 (ILG), 2017 WL 2345658, at *4 (E.D.N.Y. May 30, 2017). In *Gallagher*, the plaintiff alleged that his supervisor "directed [him] as to which tasks he was to accomplish as well as how to go about doing them," and the court held that he had not alleged any "facts [that suggested] the level of supervision necessary to control the manner and means" of his work. *Id.* The contentions are even more sparse here. In addition to the fact that the contracts labeled her an "independent contractor" and gave her the "authority to control and direct the performance of the details of the services," Mwangi's lack of sufficient factual allegations fails to meet the requirements of this most important factor. Doc. 37 at 17 (citing Docs. 26-3 § 9 and 26-4); *see also Martin v. Performance Trans., Inc.*, 408 F. Supp. 3d 272, 276 (W.D.N.Y. 2019) (holding plaintiff was an independent contractor in part because "both parties agreed that [his work] was that of an independent contractor and [that] any and all services . . . shall be provided in such capacity." (internal quotations omitted)). As Passbase recognizes, she does not "show that Passbase had the right to control the manner and means by which she accomplished her work." Doc. 37 at 18.

Mwangi provides similarly conclusory allegations regarding most of the other factors:

With respect to the skill required, Mwangi acknowledges that she had "impressive experience," needed for the positions of strategic partnerships lead or head of compliance, and cites to her past position in the field at a rival company. Doc. 26 ¶ 18. She even alleges that the

company "would not be able to pass due diligence checks" without her, and that she was required to "undertake a client-wide clean-up operation" after a data breach. *Id.* ¶¶ 36, 40. She also was given her head of compliance role to "bridge an existing knowledge gap," as she was the only employee with regulatory experience and skill. *Id.* ¶ 25. Courts have held that high "skill [possessed by the worker] weigh[s] strongly in favor of independent contractor status." *Horror Inc. v. Miller*, 15 F.4th 232, 251 (2d Cir. 2021) (holding a horror screenwriter to be an independent contractor, in part because of the skill he possessed and used to write a screenplay). Mwangi provides sufficient details regarding the skills that were actually required to fulfill her tasks, but these facts cut against her and instead demonstrate that she was more like an independent contractor. Passbase argues the same. *See* Doc. 37 at 18.

Mwangi states "Passbase provided [her] with the equipment/tools necessary to fulfil her job responsibilities," but, as Passbase recognizes in their memorandum of law, she provides no further proof or examples of equipment provided besides this conclusory statement. Doc. 26 ¶ 14; Doc. 37 at 18.

Mwangi claims that since Passbase as a whole was "built . . . to operate as a remote first company," and since they mandated all employees to work from home because of the COVID-19 pandemic, she was just like all other employees, though she does not allege that she performed any work in one of Passbase's offices. Doc. 26 ¶ 33; Doc. 37 at 18. But at the time of the contract formation, the company aimed to operate on a "partially remote basis," so the fact that Mwangi worked virtually is in fact indicative that she was closer to an independent contractor, since "[o]ften, independent contractors will complete their work off-site," and it was not yet mandated for Passbase employees to do so when Mwangi signed her contract. Doc. 26 ¶ 33; *Clesi v. Zinc Corp.*, No. 01 Civ. 374 (FJS), 2001 WL 1223456, at *6 (N.D.N.Y. Oct. 11, 2001)

(finding a janitorial worker an independent contractor even though she worked in person, as she only did so because the job required it). However, that the entire company was partially virtual from the beginning attenuates the strength of this factor.

Mwangi argues that "she was to be employed for at least a two-year term." Doc. 40 at 13. The contract itself provides that it may be extended beyond the two years. Doc. 26-4. Though there was a clear term of employment, two years is an extended period of time, which "supports a finding that [plaintiff] was an employee." *Smith v. Calypso Charter Cruises Inc.*, No. 19 Civ. 7076 (PAE), 2021 WL 4084182, at *10, *12 (S.D.N.Y. Sept. 8, 2021) (finding a yacht caterer to be an independent contractor based on other *Reid* factors, despite the long business relationship between the parties "point[ing] towards employee status."). Passbase argues that since the contract was tied to services to be performed, and was not as long as a the six-year employment of a fire department's treasurer in *Keller v. Niskayuna Consol. Fire Dist. 1*, 51 F. Supp. 2d 223, 229 (N.D.N.Y. 1999), this factor intimates that Mwangi was an independent contractor. Doc. 37 at 18–19. But considering that this was still a term of multiple years, and that there was an option to prolong the relationship, this factor suggests, but does not establish, employee status.

Mwangi alleges specific additional tasks that were given to her by Passbase, such as that she was eventually made head of compliance. Doc. 26 ¶ 25. Further, the clear examples of overarching, longer-term responsibilities she gives, like creating strategic partnerships and ensuring regulatory compliance, help to suggest employee status, since "independent contractors are typically hired only for particular projects." *Id.*; *Aymes v. Bonelli*, 980 F.2d 857, 863 (2d Cir. 1992) (finding a computer programmer to be an independent contractor). Though Passbase

claims that they could only "request" her to perform services, the specific tasks she outlines are stronger evidence of satisfying this factor.  Doc. 37 at 19.

While Mwangi simply states that she "worked full-time for Passbase" and that they "set [her] work schedule," Doc. 26 ¶ 14, she had the right to end the contract essentially at will, which she eventually decided to do.  *Id.* ¶ 60.  Passbase further demonstrates that the contract allowed "the amount of time devoted by [Mwangi] on any given day [to] be entirely within [her] control."  Doc. 37 at 17 (quoting Doc. 26-4 § 9.2).

Mwangi received a fixed monthly salary.  Doc. 26 ¶ 23.  Independent contractors are often paid using lump-sum payments, so this suggests employee status, though Passbase defines these payments as "Consulting Fees" and thus claims they still imply Mwangi was an independent contractor.  *See Horror Inc.*, 15 F.4th at 255 (citing *Reid*, 490 U.S. at 753); Doc. 37 at 19.

Mwangi simply states that she "did not hire her own assistants or staff and instead received support from other Passbase employees."  Doc. 26 ¶ 14.  It is unclear, however, whether she had the ability to hire such assistants.  Passbase claims that they had "no role in hiring and paying any assistant of" Mwangi.  Doc. 37 at 19.

Mwangi is less conclusory as regards whether her work was a part of Passbase's regular business; she gives specific examples of the ways in which her responsibilities were part of Passbase's regular operations, such as through her role increasing partnerships, distribution, and revenue growth.  Doc. 26 ¶ 25.  Passbase admits that these responsibilities "were parts of Passbase's business."  Doc. 37 at 19.  This suggests employee status.

As Mwangi alleges, Passbase is a company "engaged in the business of Data Privacy," Doc. 40 at 14 (citing Doc. 26 ¶¶ 1, 12, 14), and Passbase does not dispute that it is a going

business. Doc. 37 at 19. In general, this factor "will always have very little weight in this analysis," and it indicates little about whether Mwangi was an employee. *Aymes v. Bonelli*, 980 F.2d at 863.

The twelfth and thirteenth factors are also less important than the preceding ones. *See Eisenberg*, 237 F.3d at 117. Mwangi concedes that she was paid on a 1099, a tax form used for independent contractors, not a W-2, which is used for employees. Doc. 37 at 19; *see also Rhoda v. Rhoda*, No. 14 Civ. 6740 (CM), 2017 WL 11530950, at *36 (S.D.N.Y. June 22, 2017) (suggesting that receipt of a W-2 form, as opposed to a 1099, indicates employee status). But this is not dispositive. *See Yu v. New York City Hous. Dev. Corp.* (HDC), No. 07 Civ. 5541 (GBD) (MHD), 2011 WL 2326892 (S.D.N.Y. Mar. 16, 2011), *report and recommendation adopted sub nom. Yu v. New York City Hous. Dev. Corp.*, No. 07 CIV. 5541 (GBD), 2011 WL 2183181 (S.D.N.Y. June 3, 2011), *aff'd*, 494 F. App'x 122 (2d Cir. 2012) (finding that an employee's income being reported on a Form 1099 instead of a W-2 did not weigh heavily in the analysis, though it did suggest independent contractor status).

Though the facts Mwangi alleges for some of these factors suggest employee status, the majority of them either are insufficient to do so or even cut against employee status. Taking these factors as a whole, Mwangi fails to demonstrate an employer-employee relationship with defendants; therefore, the Title VII claims thus must be dismissed.

### C. NYCHRL and NYSHRL Claims

In addition to her § 1981 and Title VII claims, Mwangi brings additional claims against all defendants under the New York City Human Rights Law ("NYCHRL") and New York State Human Rights Law ("NYSHRL").[3] In order for a NYCHRL or NYSHRL claim to succeed, the

---

[3] Defendants allege that the Court may dismiss the state law claims for lack of supplemental jurisdiction, since the § 1981 claims and Title VII claims are the only federal questions and the state law claims are supplemental to them.

"impact of defendants' alleged discriminatory conduct" must have been felt within New York City or State, respectively. *Hoffman v. Parade Publs.*, 15 N.Y.3d 285 (N.Y. 2010) (dismissing NYCHRL and NYSHRL claims brought by a Georgia resident who worked for a publisher's office in Atlanta because the discrimination had not occurred in New York and its impact was not felt in the City or State); *see also Pedroza v. Ralph Lauren Corp.*, No. 19 Civ. 8639 (ER), 2020 WL 4273988, at *2 (S.D.N.Y. July 24, 2020) (upholding *Hoffman*'s impact test), *Vangas v. Montefiore Med. Ctr.*, 823 F.3d 174 (2d Cir. 2016) (same). While the purpose of the NYCHRL is to "expand . . . protections to non-residents who work in the city," these laws do not have unlimited reach; the impact "needs to be felt by the plaintiff in New York City." *Pedroza*, 2020 WL 4273988, at *2.

In each NYCHRL and NYSHRL claim within Mwangi's complaint, she alleges that many "of the acts and conduct complained of herein . . . occurred within the state of New York," and goes on to give conclusory statements of fact (e.g., "defendants engaged in an unlawful discriminatory practice . . . forbidden under the New York State Human Rights Law"), none of which are sufficient under the *Iqbal* 12(b)(6) standard. Doc. 26 ¶¶ 85–86. And even if the acts themselves occurred in New York, their impact was not felt in New York, because Mwangi was at all times in Berlin. *Id.* ¶ 10. So Mwangi does not adequately allege an NYCHRL or NYSHRL claim against any defendant.

Mwangi asserts multiple arguments as to why this should not be the case. First, she argues that in the midst of the COVID-19 pandemic, "physical presence in New York State/City should not be a bar to relief." Doc. 40 at 18. Without addressing this broad claim directly, the Court refuses to apply it here, because Mwangi made both of her contracts to work virtually

---

Doc. 37 at 24. The Court addresses them anyway to respond fully to the complaint, and since it ultimately dismisses them for failure to state a claim, it does not address this aspect of defendants' argument.

before COVID-19 had reached pandemic status, and does not provide any proof that she attempted to effectuate her allegedly planned move to New York during or after negotiating and signing her permanent contract in the months before the "pandemic emerged." Doc. 40 at 2. Furthermore, the Court's decision in *Pedroza* was itself decided after the pandemic had been announced. Second, the formerly "brewing controversy among state and federal courts" to which Mwangi cites concerning the extent of these laws' reach is now settled by *Vangas* and *Hoffman*, as she recognizes. *Id*. at 16. Recent precedent touches exactly on the issue at hand, and the Second Circuit has explicitly endorsed the impacts test. *See Ware v. L-3 Vertex Aerospace, LLC*, 833 F. App'x 357 (2d Cir. 2020) (denying NYCHRL and NYSHRL claims advanced by a litigant who lived in Jacksonville, Florida because the impact of the alleged discrimination was not felt in New York).

### D. Breach of Contract

Defendants ask that Mwangi's breach of contract claim be dismissed. To state a claim in federal court for breach of contract under New York law, a complaint "need only allege (1) the existence of an agreement, (2) adequate performance of the contract by the [party bringing the claim], (3) breach of contract by the [other party], and (4) damages." *Harsco Corp. v. Segui*, 91 F.3d 337, 348 (2d Cir. 1996) (citations omitted); *see also Digilytic Int'l FZE v. Alchemy Fin., Inc.*, No. 20 Civ. 4650 (ER), 2022 WL 912965, at *7 (S.D.N.Y. Mar. 29, 2022) (applying these requirements). "When pleading these elements, a plaintiff must identify the specific provision of the contract that was breached as a result of the acts at issue." *Wolff v. Rare Medium, Inc.*, 210 F. Supp. 2d 490, 494 (S.D.N.Y. 2002), *aff'd*, 65 F. App'x 736 (2d Cir. 2003) (citing *Levy v. Bessemer Trust Co., N.A.*, No. 97 Civ. 1785 (JFK), 1997 WL 431079, at *5 (S.D.N.Y. July 30, 1997)). Both parties agree that a contract existed. Doc. 40 at 22; Doc. 37 at 24. And Mwangi

performed the duties laid out in the contract before it was terminated. Doc. 26 ¶ 40. But Mwangi does not allege sufficient facts to make a plausible claim that that contract was breached. Indeed, she simply claims that "under the terms of the employment agreement, as the non-breaching party, only Plaintiff – not Defendant Passbase – can unilaterally terminate the contractual relationship without cause." Doc. 26 ¶ 106. As mentioned, the Court generally accepts as true the allegations in a complaint when considering a 12(b)(6) motion. *See Iqbal*, 556 U.S. 662. However, a court "need not accept as true an allegation that is contradicted by documents on which the complaint relies." *Employees' Ret. Sys. v. Morgan Stanley*, 814 F. Supp. 2d 344, 353 (S.D.N.Y. 2011) (quoting *Williams v. Citibank, N.A.*, 565 F. Supp 2d 523, 527 (S.D.N.Y. 2008)) (internal quotations omitted). Here, though Mwangi claims the consulting agreement allows only her to terminate the agreement, the document clearly states that it may be terminated "by *either* the Company or the Consultant upon not less than thirty (30) days . . . notice." Doc. 26-3 § 4 (emphasis added). Mwangi has therefore not adequately alleged a breach of contract claim. This claim must also be dismissed.

### E. Leave to Amend

Lastly, Mwangi has requested leave to amend the complaint in the event that defendants' motion is granted. Doc. 40 at 22. Federal Rule of Civil Procedure 15 instructs courts to "freely give leave [to amend a pleading] when justice so requires." Fed. R. Civ. P. 15(a)(2). The Second Circuit has instructed courts not to dismiss a complaint "without granting leave to amend at least once when a liberal reading of the complaint gives any indication that a valid claim might be stated." *Shabazz v. Bezio*, 511 F. App'x 28, 30 (2d Cir. 2013) (quoting *Branum v. Clark*, 927 F.2d 698, 705 (2d Cir. 1991)). In *Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, the Second Circuit reaffirmed the "liberal spirit" of Rule 15 and counseled strongly against

the dismissal of claims with prejudice prior to "the benefit of a ruling" that highlights "the precise defects" of those claims. 797 F.3d 160, 190–91 (quoting *Williams v. Citigroup Inc.*, 659 F.3d 208, 214 (2d Cir. 2011)).

With regards to Mwangi's Title VII claims and breach of contract claims, the Court recognizes that there is at least some indication that a valid claim might be stated; Mwangi may amend those claims. However, no additional facts or briefing can change the fact that Mwangi was not located in the United States when her contract was formed and when the discriminatory events that she alleges took place.[4] Therefore, amendment of the NYCHRL and NYSHRL claims and the § 1981 are dismissed with prejudice.

## IV. CONCLUSION

For the foregoing reasons, the motion to dismiss is GRANTED. Leave to amend is GRANTED as to the Title VII and breach of contract claims; and DENIED as to the NYSHRL, NYCHRL, and § 1981 claims. Mwangi may file an amended complaint, if at all, by July 5, 2022. The Clerk of Court is respectfully directed to terminate the motions, Docs. 22 and 36.

It is SO ORDERED.

Dated:   June 14, 2022
         New York, New York

                                                    Edgardo Ramos, U.S.D.J.

---

[4] Absent specific allegations in the complaint, the Court will not assume that any of the occurrences, such as the taxicab incident or meetings that Mwangi attended, occurred in New York.