UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
— — — — — — — — — — — — — — — — — — — — — — — — -X

ROSE WANJUGU MWANGI,

                             Plaintiff,            Case No. 21-CV-6728 (ER) (SDA)

       -against-                     **<u>SECOND AMENDED COMPLAINT</u>**

PASSBASE, INC.,                     **JURY TRIAL DEMANDED**

                            Defendant.
— — — — — — — — — — — — — — — — — — — — — — — — -X

      Plaintiff Rose Wanjugu Mwangi by her attorneys, Filippatos PLLC, hereby alleges against Defendant Passbase, Inc. ("Passbase" or the "Company") as follows:

<u>**NATURE OF THE CASE**</u>

      1.     This is a case against Passbase, a start-up identity verification company founded and run by three Caucasian men, two of whom traffic in racist and sexist tropes and micro-aggressions with callous and reckless abandon. Despite claiming to be a diversity-minded enterprise, Passbase set an exceptionally low bar for its policies and initiatives regarding diversity and inclusion, all while tolerating a toxic work environment based on the same old entrenched racism and sexism that continue to plague our country.

      2.     Ironically, co-founder and former CEO Mathias Klenk, who is presently the Chief Technology Officer ("CTO"), touted the Company in a 2019 interview as "an exciting and inclusive place to work" and bragged that "[s]ince many high-growth startups dropped the priority for this [-- *i.e.*, diversity and inclusion --] in order for growth (sic) [to occur] [,] [w]e want to get this right from the beginning." For Plaintiff Rose Mwangi, Mr. Klenk's false narrative of diversity and inclusion proved to be as far from the truth as she could ever have imagined.

      3.     Ms. Mwangi is an African American woman with enormous heart and immense

courage, who seeks to hold Passbase (and elements of its Founding Team)[1] accountable for violating laws that strictly prohibit workplace discrimination and retaliation on the basis of race, color, or gender, namely Title VII of the Civil Rights Act of 1964, as codified, 42 U.S.C. §§ 2000e, *et seq.* ("Title VII").

4.      Ms. Mwangi seeks damages, as well as injunctive and declaratory relief, to redress the injuries she has suffered – physical, emotional, reputational, career-wise, and pecuniary – because of being discriminated and retaliated against by her employer because of her race (African American), color (Black), and gender (female).

## JURISDICTION, VENUE, AND PROCEDURAL PREREQUISITES

5.      This Court has jurisdiction of this matter pursuant 42 U.S.C. § 2000e-5(f)(3), and 28 U.S.C. §§ 1331, 1332, and 1343.

6.      Venue is proper in this district pursuant to 28 U.S.C. § 1391(b) as Defendant resides within the Southern District of New York, and/or the acts complained of occurred therein.

7.      By Plaintiff: (a) timely filing a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC") on August 18, 2021; (b) receiving a Notice of Right to Sue from the EEOC on September 29, 2021; and (c) amending her Complaint to include the Title VII claims within 90 days of the issuance of the Notice of Right to Sue, Plaintiff has satisfied all the procedural prerequisites for the commencement of the instant action.

## THE PARTIES

8.      Plaintiff is a United States citizen who is and has been at all relevant times a resident of the country of Germany, city of Berlin.  Plaintiff is an African American female and a proud woman of color.

---

[1]      That is: Dave McGibbon, current Chief Executive Officer (and former Chief Operations Office ("COO"); Mathias Klenk, current Chief Technology Officer (and former Chief Executive Officer); and Felix Gerlach, current Chief Products Officer ("CPO") (and former Vice President ("VP") of Products).

9.      At all times relevant hereto, Passbase was and is a privately held corporation duly existing pursuant to, and by virtue of, the laws of the state of Delaware. The Company maintains a principal place of business located at 179 Franklin Street, 3rd Floor, New York, New York 10013.

10.     Upon information and belief, Passbase employs over 35 employees in an integrated global enterprise and thus is subject to Title VII.

## MATERIAL FACTS

### Plaintiff was Employed by Passbase

11.     Despite any nomenclature to the contrary, Plaintiff was an employee of the Company, who discharged her job duties and responsibilities under the absolute control – and at the behest – of the Company and the Founding Team, which principally operate in New York City.

12.     Ms. Mwangi is also clearly an employee according to the *IRS 20—Point Checklist for Independent Contractors.*[2]

13.     For instance, at no point did she make a personal profit or suffer a personal loss because of the work she performed for Passbase.  Rather, she received a salary from Passbase for a generally fixed, pre-determined amount (subject to discretionary bonuses and/or other incentive compensation) for all the work she performed, just like any rank-and-file or executive Passbase employee.

14.     Further, at no point did she have or make any investment in the equipment and facilities used to perform her work.  Rather, she worked remotely from home as many other Passbase employees and other executives have done in recent years.

15.     Plaintiff also worked exclusively for Passbase and not for any other company during her tenure at Passbase and did not offer her services to the general public during this time.  Not only

---

[2]      See    *IRS    20-Point    Checklist    for    Independent    Contractors,* http://corporate.rfmh.org/accounts_payable/forms/IRS_ChecklistforIndependentContractors.pdf  (last accessed on July 5, 2022).

that, but Plaintiff had a full-time workload at Passbase and could not reasonably work full or even part time for any other employer.

16.    Significantly, as discussed in detail below, Passbase instructed Plaintiff on how to do her job, exercised control over the terms and conditions of her work, and regarded and treated her just like any rank-and-file employee.  Indeed, Passbase provided Plaintiff with an employee handbook, which was given to all Passbase employees.

17.    Passbase closely monitored Plaintiff's work and performance, and regularly conducted performance evaluations, or so-called "360 reviews" which were completed for all full time Passbase employees.  These 360 reviews evaluated, *inter alia*: (a) whether employees were meeting their performance goals; (b) how well employees prioritized and managed their workload; and (c) areas for improvement within an employees' performance. In fact, Mr. McGibbon provided detailed and explicit feedback to Plaintiff which he expected to be followed via her 360 reviews.

18.    Further, Plaintiff attended near daily meetings titled "Daily Standup" with Passbase's sales, human resources, and marketing teams, which were mandatory for all Passbase employees, and began each day at 9:00am EST.  During these meetings, Plaintiff, along with other Passbase employees, detailed to all those attending the meeting the specific tasks they had completed the previous day, as well as outlined what tasks were on their to-do list going forward.  In other words, the goal of these meetings was primarily so that each person at the meeting knew what everyone else was working on and had worked on, and would feel and be accountable for their work to their peers.

19.    In addition, any employees who had cross-department projects which needed trouble shooting or support used these meetings to solicit feedback and support.  To put it differently, Plaintiff routinely had to attend meetings in which integral parts and elements of Passbase's business operations – as opposed to narrow discussions pertaining to specific projects or assignments within a department – were discussed.

20.    Plaintiff was also required to attend weekly "Leads" meetings for all team leaders, which were mandatory for Passbase employees in management positions.  These "Leads" meetings included integral department leaders and other executives such as the CEO, CTO, VP of Engineering, Head of Security, VP of Sales, Head of HR, VP of Products, CPO, Chief of Staff, VP of Marketing, Head of Strategic Partnerships, and the Head of Compliance.

21.    During these meetings, the CEO and CTO reviewed each department's quarterly performance goals and set new goals for the next quarter.  In other words, Plaintiff was expected to achieve broad, long-term business goals for her department like all other department leaders and high-level executives at Passbase.

22.    Additionally, Plaintiff and other Passbase employees conducted bi-weekly reviews of each department's progress in that quarter, with each department presenting what it accomplished in the preceding two weeks.

23.    Moreover, the Company used Key Performance Indicators ("KPI") to judge each department's success and would hold post-mortem meetings at the end of each quarter with department leaders, including Plaintiff, to review KPI results.  Notably, Plaintiff's quarterly KPIs required approval from the CEO and COO who were responsible for overseeing all integral Passbase departments.

24.    After these post-mortem meetings, each department head presented their department's performance to all employees at an "All Hands" town hall meeting held each quarter.

25.    Mr. McGibbon closely supervised Plaintiff at all relevant times.  She had one-on-one meetings with him every two weeks during which they held in-depth discussions about the various projects and tasks assigned to her.

26.    During these meetings, Mr. McGibbon explained how he expected the projects he assigned to Plaintiff to be handled, and the order in which they needed to be completed.  For instance,

Mr. McGibbon set performance goals for Plaintiff's department which Plaintiff understood were priorities that needed more focus from her than other tasks. Mr. McGibbon regularly met with Plaintiff to discuss her department's performance, including before Plaintiff presented her department's achievements to the entire Company at the "All Hands" meetings. In other ways, Passbase largely controlled and dictated the manner and means by which Plaintiff was expected to perform her job, and the messaging she generally gave to other staff and leaders about her department's performance.

27.    Further, Passbase monitored and oversaw Plaintiff's work-related communications by requiring her to use a Passbase email address that was the Company's property and within its control, as evidenced by how Passbase abruptly disabled Plaintiff's access to her Passbase email account after she was fired, leaving her with no way to access any of her documents and communications.

28.    In addition, virtually all communications Plaintiff had with Passbase and its clients were facilitated via Passbase's company *Slack* account, in which Plaintiff was labeled as an employee level user, and not as a guest or some other type of user. Passbase would typically give *non-employees*, such as auditors or consultants, a "guest" *Slack* account if they needed to speak to Company employees with a level of access corresponding to the Company's comfort with affording that person access to confidential and proprietary information. Moreover, all of Passbase's documents were managed, shared, and distributed in the Passbase notion workspace – where everything from handbooks, training materials, meeting minutes etc., could be accessed by each employee only by using credentialed access associated to each employees' name. Indeed, Plaintiff also had full access to the Company's notion workspace as well. In other words, the Company trusted Plaintiff so much and thought of her as a member of its team and not a third party "non-employee" that it did not restrict her *Slack* account or workspace access.

29.    With respect to the remaining points on the IRS's independent contractor checklist, Plaintiff led two of Passbase's most integral departments – the Strategic Partnerships Department and

the Compliance Department.  In these roles, Plaintiff was responsible for training all employees in sales, marketing, and operations in regulatory compliance and the basics of anti-money laundering and know-your-customer practices during their onboarding process.

30.     Plaintiff also communicated with and educated Passbase employees on an ongoing, ad hoc basis about key regulatory matters affecting the business and their work.

31.     Plaintiff was also responsible for communicating directly with Passbase's valued customers *on Passbase's behalf* to facilitate sales processes and client onboarding to Passbase's platform.  Plaintiff also revamped Passbase's privacy policy.

32.     In addition, Plaintiff performed her services personally and did not hire her own assistants or staff, but instead received support from other Passbase employees when needed.  For example, Plaintiff worked with Passbase's engineering team to update the Company's website whenever there were changes made to the Company's privacy policies.

33.     Furthermore, Plaintiff worked with the Company's Security department to create security questionnaires for clients.  The Security department also assisted Plaintiff with running quarterly internal security checks to ensure the Company's platform was complying with data privacy requirements.

34.     Moreover, Plaintiff worked with Passbase's Operations team to communicate with Passbase customers about regulatory matters.

35.     In other words, Plaintiff freely and regularly worked with other integral departments within Passbase to get her work done.

36.     Further, Plaintiff and Passbase had a continuous working relationship without any gaps or breaks until she was unlawfully terminated.

37.     Plaintiff also reported directly to Passbase employees.

38.     Passbase also dictated Plaintiff's work schedule.  For instance, Passbase required

Plaintiff to be available for at least four hours each day to immediately answer questions from anyone at the Company so that communications and workflow ran smoothly, even though the Company stationed employees across multiple different time zones.

39.    Passbase also controlled Plaintiff's pay schedule, *i.e.*, when she received her wages. Plaintiff received a monthly paycheck, just like other Passbase employees, and even received the same holiday gift as Passbase's employees. Moreover, anytime Plaintiff had a question regarding her compensation, she would reach out to Passbase's HR department and/or Mr. McGibbon to receive clarification.

40.    Plaintiff worked full-time for Passbase, and the Company controlled the situs – *i.e.*, the virtual workspace – where all her work was to be performed. On top of that, Plaintiff was required to use the Company-managed Google Workplace and/or *Slack* accounts when interacting with colleagues and completing Passbase tasks. In other words, while perhaps Passbase did not have control over the physical space that Plaintiff worked from, this is immaterial when considering how Plaintiff had no way to do her work unless Passbase gave her permission to enter its virtual premises.

41.    Passbase also gave Plaintiff long-term assignments of a continuous nature, which included, *inter alia*, creating strategic partnerships and ensuring regulatory compliance on a continuing basis. These were not short-term projects with end dates that accomplished a particular task, but operational tasks that were integral to running a business like Passbase and needed to be constantly monitored, refined, and calibrated.

42.    In addition, while Passbase ultimately terminated Plaintiff's employment, she always maintained the right and ability to end her employment relationship with Passbase if she so chose like any typical at-will employment relationship, without financial or other consequences.

43.    Thus, Plaintiff functioned as an employee of Passbase in all relevant facets, despite how Passbase may have tried to classify her in documents.

**Passbase Hires Plaintiff at a Discriminatorily Low Salary**

44.    At the time of her hiring, Plaintiff had over ten years of experience in the RegTech space (*i.e.*, the management of regulatory processes within the financial industry through technology).

45.    It was therefore no surprise that Plaintiff was heavily sought by numerous RegTech companies.  Ultimately, Passbase's Founding Team interviewed Ms. Mwangi and hired her for the position of Strategic Partnerships Lead in October 2019.

46.    Passbase's Founding Team attempted to acquire Ms. Mwangi's professional services at a below market rate of compensation.  She and the Company agreed that her employment was to proceed through a 90-day probationary period with a start date of October 31, 2019, during which time Ms. Mwangi would earn a total of $24,000 in compensation.  Ms. Mwangi and Passbase entered into a "Consulting Agreement" to this effect, a correct and complete copy of which is annexed hereto as **Exhibit A.**

47.    During their salary negotiations, Mr. McGibbon proffered the following troubling reasoning as to why the Company was not willing to pay Plaintiff at the market rate: "It's not nearly what you asked for**, *or frankly what you're worth***, but circumstances made creating a Berlin role of that value impossible.  We would have mutiny on our hands if we paid you more."  Plaintiff was taken aback by this rather direct discriminatory comment.  The clear implication from this statement was that the all-Caucasian senior executive team could not countenance a woman of color earning a salary commensurate to theirs, and Mr. McGibbon was not about to go to bat for Plaintiff even though he knew she was well worth what she asked to be paid.

48.    Passbase renewed its employment agreement with Ms. Mwangi in February 2020 for an additional two-year term to end on February 12, 2022.  Under this agreement, Ms. Mwangi was to be compensated at a rate of $7,500 per month, *i.e.*, $90,000 in annual salary, but also was eligible for

a discretionary bonus of $6,000 at the end of the fiscal year, which was referred to as a "Success Fee."

49.     Ms. Mwangi and Passbase executed a new "Consulting Agreement" to this effect, a correct and complete copy of which is annexed hereto as **Exhibit B.**   Notably, Passbase failed to pay Plaintiff a bonus in 2021 (after she engaged in protected activity) despite meeting her KPIs for the fiscal year.

50.     Plaintiff's responsibilities as a Strategic Partnerships Lead included, *inter alia*: (i) to drive distribution and revenue growth of Passbase's platform; (ii) to improve product performance and scope with technical partners, and procurement of third-party databases capable of extending Passbase's product capacity; and (iii) to foster industry alliances to increase trust and system importance in the industry.

51.     As her presence at Passbase grew, Plaintiff was additionally expected to take on the responsibilities of Head of Compliance, including communications with clients regarding any regulatory compliance issue.  Significantly, this was not a responsibility that was identified in her "Consulting Agreement."

52.     Beginning in March 2021, Jenna Bachrouche became Passbase's Head of Human Resources ("HR"), Talent, and People.  Mr. McGibbon acted as the Company's *de facto* HR Director prior to this point.

53.     Beginning in March 2021, Mr. McGibbon became CEO after being the COO.

54.     Also, in March 2021, Mr. Klenk became CTO after previously being CEO.

**Plaintiff Experiences Racist and Sexist Hostility by Members of the Founding Team After Becoming Head of Compliance**

55.     By January 2020, it became clear to Plaintiff that no one at Passbase was closely overseeing regulatory compliance at the Company and that Passbase would not be able to pass due diligence checks imposed by its potential strategic partners.

56.     For example, during 2020, Passbase failed to pass due diligence checks imposed by potential strategic partners such as Wunder Mobility and Mambu Composable Banking.

57.     Accordingly, Ms. Mwangi began to interface with the compliance and regulatory officers of Passbase's existing and potential clients in the first quarter of 2020.

58.     In or about July 2020, Plaintiff was given the title of Head of Compliance by the Founding Team but was not afforded any additional compensation for undertaking that important role. Upon information and belief, Caucasian male senior executives at Passbase were afforded additional compensation for undertaking important additional roles during their employment at the Company.

59.     During the fourth quarter of 2020, Mr. McGibbon confirmed to head of Security, Alan Zanatta, that Plaintiff was to be listed as the Head of Compliance on all audit applications (ISO/IEC 27001) submitted to the International Organization Standardization (ISO) and the International Electrotechnical Commission (IEC), which form the specialized system for worldwide standardization in the field of information technology ("IT"). Upon information and belief, much of this communication about Plaintiff's role as Head of Compliance in the ISO/IEC 27001 audit applications, as well as the bulk of the preparatory work she oversaw for same, took place in New York.[3]

60.     Upon information and belief, by December 2020 – despite Plaintiff's best efforts – Passbase experienced numerous security breaches, including one in which personally identifiable information (such as biometric images used by facial recognition platforms) from data subjects – *i.e.*, clients' end-users – was inadvertently shared publicly without end-user consent. Plaintiff had to undertake a client-wide clean-up operation to make certain that the unauthorized personal biometric data of clients' end-users remained secure and was not inappropriately released.

---

[3] The ISO and IEC have established a joint technical committee (the "ISO/IEC") to oversee the terms and definitions commonly used by information security management systems ("ISMS").

61.    Remarkably, although Plaintiff secured this potential data breach for Ramp Swaps Ltd. ("Ramp") – which, upon information and belief, is currently Passbase's largest client – she was later criticized by Mr. McGibbon for allegedly being "perceived as aggressive" by Ramp because of her "tone."

62.    Whether what Mr. McGibbon said was true or false (and therefore pretextual) in his attribution of this racially tinged and sexist statement to Ramp remains to be determined at trial.  It can be stated with certainty, however, that the statement was unlawful – no matter who originated it.

**Plaintiff is Sexually Harassed by a Male Executive; Passbase Does Nothing in Response**

63.    During a taxicab ride on October 16, 2020, following a Company event, Andrei Strugaru, VP of Engineering, directed the following sexist remark towards Plaintiff: ***"women belong in the kitchen, because men don't do a good job there."*** Nicholas Brugneaux, Lead Backend Engineer, and Mr. Gerlach were also in this cab.

64.    This disturbing comment was unsolicited and in direct response to a separate conversation Ms. Mwangi was having with Mr. Brugneaux in which Plaintiff was praising Mr. Brugneaux's culinary skills.

65.    Both Mr. Brugneaux and Plaintiff were flabbergasted by Mr. Strugaru's sexist remark and continued their conversation without acknowledging him.

66.    Prior to this, on March 8, 2020, during one of their very first interactions, Mr. Strugaru had offensively and suggestively asked Plaintiff for the name of the perfume she was wearing, so that he could supposedly "buy it for … [his] wife."

67.    On October 16, 2020, Ms. Mwangi informed Ms. Bachrouche of the sexist comments Mr. Strugaru had made to her earlier that day.

68.    Ms. Bachrouche then set up a meeting for October 20, 2020, that was to include herself, Plaintiff, and another employee at Passbase named Emily Brenner, a "consultant" with whom Plaintiff

had never interacted, to discuss the sexual harassment each of them (Plaintiff and Ms. Brenner) was purportedly experiencing at the hands of Mr. Strugaru. Ms. Brenner ultimately did not attend the meeting.

69.     After the meeting, Ms. Bachrouche informed Mr. Klenk of Plaintiff's complaint of sexism and sexual harassment in the workplace, and on October 29, 2020, Mr. Klenk discussed this issue with Ms. Mwangi during a previously scheduled meeting.

70.     Rather than take Plaintiff's complaint of sexual harassment seriously, Mr. Klenk laughed uncomfortably during the meeting. Then, in a ham-handed attempt to excuse Mr. Strugaru's sexist remarks and avoid having to address the obvious inappropriate nature of Mr. Stugaru's conduct, Mr. Klenk informed Ms. Mwangi that "Andrei meant it as a compliment," while also asserting that he "didn't want to deal in hearsay," or in other words, that he did not want to acknowledge that she could be telling the truth.

71.     Plaintiff noted to Mr. Klenk that both Messrs. Brugneaux and Gerlach were in the car during the exchange in question should he wish to corroborate the information and not "deal in hearsay."

72.     Nevertheless, no further action was ever taken regarding Ms. Mwangi's October 16, 2020, complaint of sexist behavior and sexual harassment in the workplace.

73.     On December 23, 2020, in a reactionary response to Plaintiff's complaints about Mr. Strugaru, Mr. McGibbon attacked Plaintiff's judgment by exclaiming, "after what we've done for you?!"

74.     This statement evidenced a marked and unlawful disregard for Plaintiff's legitimate concerns about sexism and sexual harassment in the workplace.

75.     By February 25, 2021, Mr. Strugaru's behavior had become so problematic that even Ms. Bachrouche confided to Plaintiff over private *Slack* communications – and later in a regularly

13

scheduled bi-weekly meeting on March 4, 2021 – that she had to "go around" Mr. Strugaru in her recruiting efforts for the Engineering Team, especially because he "had made concerning racist remarks about South Indians in the recruiting funnel."

76.    Earlier, on February 25, 2021, during a "Women at Passbase" meeting, Honelyn Go, who was the only female Engineer at Passbase, described an incident that she believed was sexist, in which a male colleague had forced her to publicly apologize for something in a way that – upon information and belief – she felt was discriminatory and belittling.

77.    Plaintiff communicated to Ms. Bachrouche later that day via *Slack* that she believed Ms. Go may have been referring to Mr. Strugaru, as he had previously treated Plaintiff in a similarly sexist manner.

78.    Ms. Mwangi also discussed with Ms. Bachrouche how a lack of accountability in addressing Mr. Strugaru's behavior could be a reason why the offensive conduct was continuing and affecting most, if not all, of the (albeit few) female employees at Passbase.  In response, Ms. Bachrouche stated that the Founding Team members were "finally starting to get it."

79.    Upon hearing Ms. Bachrouche's comment, Plaintiff was shocked and especially troubled to realize the level of insignificance with which Passbase was treating the complaints of at least three separate women, over a period of five months, regarding Mr. Strugaru's sexist and harassing behavior.

80.    Meanwhile, male and Caucasian coworkers, including Mr. Strugaru, actively blocked Ms. Mwangi from being able to contribute ideas by cutting her out of decision-making processes or going "above" her when she made a decision that may not have aligned with their opinions.

81.    In one such incident, Passbase held a company-wide meeting regarding corporate culture following an incident in which a violent, racially-triggering image or "meme" (of a man being beaten with batons by three men who is laying prostrate on the ground next to a journalist documenting

14

the beating while a police officer in riot gear stands idly by observing the mayhem) was posted to a *Slack* channel by a Caucasian male colleague.

82.    During this meeting, various male colleagues, including members of the Founding Team, began chastising *Ms. Mwangi* for "publicly shaming" the colleague who had posted the image because she had asked him to remove it.

83.    Plaintiff found this behavior to be sexist, racially insensitive, and offensive, especially since it was entirely reasonable for Plaintiff to ask that the triggering imagery be removed.

84.    Adding insult to injury, the day after the incident, but prior to the Company-wide meeting, Mr. Klenk mockingly implied that he had "deliberated" whether to post a "meme" that depicted a house on fire – more offensive imagery for a woman of color cognizant of the horrific history of racial violence in United States – "because it also shows violence."

85.    Despite all this, Plaintiff and Ms. Bachrouche were castigated for an hour during the aforementioned meeting simply for escalating the issue.

86.    As a result of these disturbing events, Plaintiff developed stress-induced symptoms related to her medical diagnosis of fibroid tumors – a diagnosis of which Defendants were aware. For example, Plaintiff's feet became so swollen she could not put on shoes, and she was in so much back and upper body pain that she could barely sit up.

**Weeks After Complaining About Sexual Harassment, Plaintiff is Noticeably and Systematically Excluded from Blog Posts Designed to Celebrate Key New Hires Like Her**

87.    On December 17, 2020, Mr. Klenk authored a blog post entitled, "2020 A Year in Review," the purpose of which was to acknowledge and celebrate new key hires at Passbase with the public.

88.    Specifically, under a section entitled, "Doubling Our Talent and Opportunities," Mr. Klenk named nearly every single key hire Passbase had made in 2020, including VP of Sales Dan Lee,

VP of Products Sidney Francois, VP of Engineering Mr. Strugaru, Head of People and HR Ms. Bachrouche, and Solutions Engineer Amanda Gorfine.

89.    Shockingly, despite having officially joined Passbase as the Lead of Strategic Partnerships in February of 2020, Plaintiff was nowhere to be found in the blog post.

90.    Indeed, Plaintiff — the only Black woman to ever work for Passbase and only woman of color to attain a leadership position prior to May 2021 — was insultingly the *only* 2020 "key hire" excluded from the blog post.

91.    On January 22, 2021, in her supposedly diversity-minded blog post, "It's 2021. Diversity cannot stay reactive," Ms. Bachrouche, doubled down on Mr. Klenk's earlier dismissiveness towards and marginalization of Plaintiff's accomplishments by stating about herself: ***"coming into a company led by straight, white men where there was no presence of a woman in a senior leadership, or managerial role, was a moment for pause"*** (emphasis added).

92.    Indeed, despite the scope and importance of her responsibilities and level of expertise, and the impressiveness of her achievements at the Company, Passbase clearly did not consider Ms. Mwangi a "talent" or part of the leadership team at Passbase.

**Plaintiff Suffers Further Discrimination and Retaliation Based on Her Race and Gender**

93.    During Plaintiff's first annual review on March 18, 2021, Mr. McGibbon again offered offensive feedback regarding her supposed "tone" when interacting with clients.

94.    Specifically, Mr. McGibbon stated that Plaintiff's tone "has been perceived as aggressive by the receiver."

95.    This assessment was extremely distressing to Plaintiff given its abhorrent racist undertones.  Moreover, Mr. McGibbon had never brought this issue up at any of their regular one-on-one meetings.

96.    Mr. McGibbon went on in the review to state: "I think we can understand/improve this

by using something akin to the 'radical candor' framework.  Being direct is great, but we need to make sure things are communicated with empathy, especially when she is right."

97.    The term "radical candor framework" referred to a pictograph Mr. McGibbon included with his message, annexed as **Exhibit C**, regarding Plaintiff's tone.  Shockingly, this diagram depicts the opposite of "radical candor" as ***obnoxious aggression.***"

98.    Offended by the racist undertones in Mr. McGibbon's comments, on March 18, 2021, Plaintiff complained to Ms. Bachrouche over *Slack* about the use of the term "aggressive" as being a racist dog whistle.

99.    In response, Ms. Bachrouche asked for Plaintiff's consent to inform Mr. McGibbon of the problematic language he had used, with the aim of "finding a better mode for [Mr. McGibbon] to communicate his feedback."

100.    Subsequently, on March 18, 2021, Mr. McGibbon apologized to Plaintiff, but on the very next day, March 19, 2021, he re-assumed his campaign of racist language towards Plaintiff, this time calling her "skeptical" in an email exchange regarding the initial feedback.

101.    At this point, it became clear to Plaintiff that her concerns regarding bias, discrimination, and retaliation at Passbase were not being taken seriously, as Mr. McGibbon was now fully aware of the pernicious implications associated with his chosen language but chose to do nothing to alter his problematic behavior.

**Plaintiff is Unlawfully Fired in Retaliation for Her Complaints**

102.    As described above, beginning in late-2020, Plaintiff reported the harassment and discrimination she was experiencing to members of Passbase's Founding Team, including Mr. McGibbon and Mr. Klenk, as well as to Ms. Bachrouche.

103.    Following her annual review in March 2021, Plaintiff further complained to Mr. McGibbon and Ms. Bachrouche about the racial discrimination she continued to experience at

Passbase.

104.    On May 19, 2021, absolutely dejected and dismayed after having heard nothing for approximately two months following her complaints of discrimination in relation to her March 2021 review, Plaintiff sent a letter to Ms. Bachrouche exploring the possibility of ending Ms. Mwangi's employment contract in December 2021 rather than in February 2022 as originally contemplated by the employment agreement.

105.    Showing remarkable professionalism, grace, and poise, Plaintiff made clear that she was providing for a "long lead time…to ensure that all priorities committed to are accounted for, as well as any other urgent business Passbase shall want to incorporate over the next two quarters can be sufficiently addressed," despite her extreme dismay about the discriminatory and retaliatory treatment she was suffering.

106.    Thereafter, on June 21, 2021, Tonianne Florentino of Florentino & Grimshaw, LLC – a New York City-based law firm – notified Plaintiff that her firm had been retained by the Advisory Board of Passbase to conduct an external investigation into the concerns raised by Plaintiff.

107.    Shockingly, following Plaintiff's March 2021 complaints regarding discrimination and retaliation, and completely ignoring her May 2021 letter, Passbase further derailed Ms. Mwangi's career by notifying her on or about July 1, 2021, that the Company intended to terminate her "Consulting Agreement," which was to end in February 2022, prematurely on July 31, 2021.

108.    On July 1, 2021, Plaintiff sent a statement to Ms. Florentino, which detailed her previously documented complaints of Defendants' unlawful and discriminatory conduct.  To date, no one has informed Plaintiff regarding the findings of said investigation, nor, upon information and belief, has Passbase taken any remedial action to address Plaintiff's concerns.

109.    In fact, on July 30, 2021, Ms. Florentino rejected Ms. Mwangi's request for an update on the findings of her investigation by stating that "any communications relating to investigation

findings are provided only to the Passbase [Advisory] Board."

110.    To date, no one from either Passbase's Advisory Board or its Founding Team has informed Ms. Mwangi of any investigatory findings.

111.    On July 29, 2021, Plaintiff again complained to Passbase's investigative agent about the unlawful conduct she had suffered while employed at Passbase.

112.    Within days, Plaintiff's employment with Passbase was unilaterally terminated by Passbase.

113.    Passbase's premature termination of Plaintiff's "Consulting Agreement" was clearly further retaliation for her opposition to unlawful discrimination.

114.    As a result of the wanton discrimination and retaliation she has experienced while employed at Passbase, Plaintiff has suffered stress-induced outbreaks relating to underlying medical issues, including fibroid tumors.  Additionally, Plaintiff's friends and family have noticed a change in her usual upbeat, bubbly personality and have told her they do not recognize her anymore.

115.    Plaintiff has been unlawfully discriminated and retaliated against, humiliated, and degraded, and as a result, suffered loss of rights, emotional distress, humiliation, degraded career prospects and earning potential, pay disparity, and lost wages.

116.    Plaintiff's contract has been terminated prior to the expiration of its term as a result of unlawful discrimination and retaliation.

117.    As a result of Defendant's actions, Plaintiff feels extremely degraded, victimized, embarrassed, and emotionally distressed.

## FIRST CAUSE OF ACTION
### DISCRIMINATION AND HOSTILE WORK ENVIRONMENT UNDER TITLE VII

118.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

119.    Based on the facts alleged herein, Passbase engaged in unlawful employment practices prohibited by Title VII by discriminating against Plaintiff because of her race (African American), color (Black), and gender/sex (female).

120.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, economic and pecuniary losses (past and future) – such as income, salary, bonuses, and other compensation that her employment entailed, severe emotional, psychological and physical stress, distress, anxiety, pain and suffering, the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

121.    Accordingly, as a result of the unlawful conduct of Passbase set forth herein, Plaintiff has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, punitive damages.

**SECOND CAUSE OF ACTION**
**RETALIATION UNDER TITLE VII**

122.    Plaintiff repeats and realleges each and every allegation made in the above paragraphs of this Complaint as if fully set forth herein.

123.    Based on the facts alleged herein, Passbase engaged in unlawful employment practices prohibited by Title VII by retaliating against Plaintiff for engaging in protected activity by complaining of discrimination based on her race (African American), color (Black), and gender/sex (female).

124.    As a result of the acts and conduct complained of herein, Plaintiff has suffered and will continue to suffer damages, including, but not limited to, economic and pecuniary losses (past and future) – such as income, salary, bonuses, and other compensation that her employment entailed, severe emotional, psychological and physical stress, distress, anxiety, pain and suffering, the inability to enjoy life's pleasures, and other non-pecuniary losses and special damages.

125.    Accordingly, as a result of the unlawful conduct of Passbase set forth herein, Plaintiff

has been damaged and is entitled to the maximum compensation available to her under this law, including, but not limited to, punitive damages.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests a judgment against the Defendant:

A.      Declaring that Defendant engaged in, and  enjoining  Defendant  from continuing to engage in, unlawful employment practices prohibited by Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e, *et seq*., in that Defendant discriminated against Plaintiff based on her race (African American), color (Black), and gender/sex (female), and retaliated against Plaintiff for engaging in protected activity;

B.      Ordering Defendant to reinstate Plaintiff and employ her through the remaining term in her employment agreement;

C.      Awarding damages to Plaintiff for denial of equal pay and bonuses resulting from Defendant's unlawful discrimination and retaliation and to otherwise make her whole for any monetary losses suffered as a result of such unlawful employment practices;

D.      Awarding Plaintiff compensatory damages for mental, emotional, and physical injury, distress, pain and suffering and injury to her reputation, career prospects, and earning potential in an amount to be proven at trial;

E.      Awarding Plaintiff punitive damages;

F.      Awarding Plaintiff attorneys' fees, costs, disbursements, and expenses incurred in the prosecution of this action; and

G.      Awarding Plaintiff such other and further relief as the Court may deem equitable, just, and proper to remedy Defendant's unlawful employment practices against her.

## JURY DEMAND

Plaintiff requests a jury trial on all issues to be tried.

Dated: July 5, 2022
    White Plains, New York

Parisis G. Filippatos
Elan A. Ginzberg

**FILIPPATOS PLLC**
*Attorneys for Plaintiff*
199 Main Street, Suite 800
White Plains, NY 10601
Tel/Fax: (914) 984-1111
Pgf@filippatoslaw.com
eginzberg@filippatoslaw.com

*/s/ Parisis G. Filippatos*
Parisis G. Filippatos (PF-1593)